UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

IN RE:

BANCROFT HOLDING LLC

Debtor

CHAPTER 7

CASE NO. 25-40356-EDK

# MOTION FOR RELIEF FROM STAY AND REQUEST FOR EXPEDITED DETERMINATION

To the Honorable Elizabeth D. Katz, Bankruptcy Judge:

Now comes Avidia Bank ("Avidia" or the "Bank"), your moving party in the within Motion, and hereby represents as follows:

1. Avidia currently has a secured party auction scheduled of the Debtor's collateral, for April 30, 2025. This auction was scheduled before the Debtor filed for bankruptcy protection. This is the reason for the request for the expedited determination. A copy of the brochure for that auction is attached hereto as Exhibit "F", and later herein further referenced in context.

2. Avidia Bank is a banking institution with a usual place of business located at 42 Main Street, Hudson, Middlesex County, Massachusetts.

3. That the debtor, Bancroft Holding LLC (the "Debtor"), is a Massachusetts

limited liability company with an address of 851 Sterling Road, Lancaster, Worcester County, Massachusetts.

4. On April 7, 2025, the Debtor filed a petition under Chapter 7 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Massachusetts.

5. The Bank is the holder of a promissory note dated July 6, 2018, and executed and delivered by the Debtor to Avidia in the original principal amount of $3,100,000.00 (the “$3,100,000.00 Note”). A copy of the $3,100,000.00 Note, including all extensions, revisions, amendments, modifications, and changes in terms related thereto, is attached hereto and incorporated herein as Exhibit “A”.

6. The Bank is the holder of a commercial security agreement dated July 6, 2018 given by the Debtor to Avidia securing the $3,100,000.00 Note, including all extensions, revisions, amendments, modifications, and changes in terms related thereto (the “$3,1000,000.00 Note Security Agreement”). A copy of the $3,100,000.00 Note Security Agreement is attached hereto and incorporated herein as Exhibit “B”.

7. The Bank is the holder of a promissory note dated July 26, 2018, and executed and delivered by the Debtor to Avidia in the original principal amount of $350,000.00 (the “$350,000.00 Note”). A copy of the $350,000.00 Note, including all extensions, revisions, amendments, modifications, and changes in terms related thereto, is attached hereto and incorporated herein as Exhibit “C”.

8. The Bank is the holder of a commercial security agreement dated July 26, 2018 given by the Debtor to Avidia securing the $350,000.00 Note, including all extensions, revisions, amendments, modifications, and changes in terms related thereto (the "$350,000.00 Note Security Agreement"). A copy of the $350,000.00 Note Security Agreement is attached hereto and incorporated herein as Exhibit "D".

9. The $3,100,000.00 Note Security Agreement and the $350,000.00 Note Security Agreement provide the Bank a security interest in all of the business assets of the Debtor (the "Collateral").

10. There is no other collateral securing the $3,100,000.00 Note or the $350,000.00 Note.

11. As of April 7, 2025, the Bank is owed $2,257,995.87, plus legal fees and costs pursuant to the outstanding balance owed under the $3,100,000.00 Note.

12. As of April 7, 2025, the Bank is owed $351,132.05, plus legal fees and costs pursuant to the outstanding balance owed under the $350,000.00 Note.

13. According to an appraisal by Kingfish Capital Advisors, LLC, the fair market value of the Collateral is $864,850.00 and the orderly liquidation value is estimated at $697,350.00. A copy of the Kingfish Advisors, LLC appraisal report is attached hereto and incorporated herein as Exhibit "E".

14. There is therefore no equity in the Collateral.

15. Avidia Bank seeks relief from stay as a secured creditor to enforce its right

under its loan documents and applicable law. In support thereof, Avidia Bank states that it is entitled to relief, pursuant to 11 U.S.C. 362 (d)(1) for cause, including but not limited to, on the basis that the Debtor is in default on said contractual obligations.

16. On or about March 4, 2025, after notice and a prior hearing in state court, the Bank took possession of the Collateral.

17. On or about March 6, 2025, undersigned counsel heard from Debtor's counsel, that he had been retained by Debtor, but that he did not object at that time to the Bank's actions in taking possession: "We have no issue with the seizure."

18. On or about March 4, 2025, the Bank engaged Aaron Posnik Auctioneers to conduct a secured party sale by public auction of the Debtor's assets, which is currently scheduled and advertised to occur on Wednesday, April 30, 2025. A copy of the brochure for the secured party auction is attached hereto and incorporated herein as Exhibit "F".

19. On or about April 2, 2025, the landlord has taken possession of the assets or relinquished possession back to the Debtor.

20. The Bank requests that a hearing on this motion be scheduled for Wednesday, April 23, 2025, so that the current April 30, 2025 auction date can remain in place.

WHEREFORE, Avidia Bank prays that it, and its successors and/or assigns, be granted

relief from automatic stay for the purpose of: (i) exercising its rights under its
agreements with the Debtor and under applicable law, including, without limitation,
taking possession of the Collateral; (ii) preserving its right to seek any deficiency to the
extent permitted by state and federal law, including 11 U.S.C. §524(a); (iii) bringing such
actions, including, without limitation, summary process proceedings, as are permissible
by law; (iv) that this Court grant the request for expedited determination and schedule a
hearing on this motion for April 23, 2025; and (v) that the Court order such other and
further relief as may be just and proper.

Respectfully submitted,

AVIDIA BANK
By Its Attorney

/s/ Howard B. D'Amico
Howard B. D'Amico, Esq.
Howard B. D'Amico, P.C.
33 Waldo Street
Worcester, MA 01608
(508) 793-1606
hdamico@hbdpc.com

Dated:   April 17, 2025

Exhibit A

The guaranteed portion of this Note has been transferred to a Registered Holder for value.

Avidia Bank : Bart H. Murphy – Executive Vice President Dated: 8/6/18

SBA U.S. Small Business Administration

U.S. Small Business Administration

# NOTE

| SBA Loan # | 27262870-06 |
|---|---|
| SBA Loan Name | Bancroft Holding LLC |
| Date | 7/6/2018 |
| Loan Amount | $3,100,000.00 |
| Interest Rate | Variable - 2.75% over WSJ Prime Rate adjusting every calendar quarter |
| Borrower | Bancroft Holding LLC |
| Operating Company | N/A |
| Lender | Avidia Bank |

1. PROMISE TO PAY:

In return for the Loan, Borrower promises to pay to the order of Lender the amount of Three Million One Hundred Thousand and 00/100 Dollars, interest on the unpaid principal balance, and all other amounts required by this Note.

2. DEFINITIONS:

"Collateral" means any property taken as security for payment of this Note or any guarantee of this Note.

"Guarantor" means each person or entity that signs a guarantee of payment of this Note.

"Loan" means the loan evidenced by this Note.

"Loan Documents" means the documents related to this loan signed by Borrower, any Guarantor, or anyone who pledges collateral.

"SBA" means the Small Business Administration, an Agency of the United States of America.

This is a true and certified copy of the Original.

By: Bart H. Murphy : Executive Vice President Date: 8/6/18

3. PAYMENT TERMS:

Borrower must make all payments at the place Lender designates. The payment terms for this Note are:

The interest rate on this Note will fluctuate. The initial interest rate is 7.50% per year. This initial rate is the Prime Rate in effect on the first business day of the month in which SBA received the loan application, plus 2.75%. The initial interest rate must remain in effect until the first change period begins unless reduced in accordance with SOP 50 10.

Borrower must pay principal and interest payments of $36,797.55 every month, beginning one month from the month this Note is dated; payments must be made on the 5th calendar day in the months they are due.

Lender will apply each installment payment first to pay interest accrued to the day Lender receives the payment, then to bring principal current, then to pay any late fees, and will apply any remaining balance to reduce principal.

The interest rate will be adjusted Calendar Quarter (the "change period"). The first interest rate adjustment date is October 1, 2018.

The "Prime Rate" is the Prime Rate in effect on the first business day of the month (as published in the Wall Street Journal newspaper) in which SBA received the application, or any interest rate change occurs. Base Rates will be rounded to two decimal places with .004 being rounded down and .005 being rounded up.

The adjusted interest rate will be 2.75% above the Prime Rate. Lender will adjust the interest rate on the first calendar day of each change period. The change in interest rate is effective on that day whether or not Lender gives Borrower notice of the change.

The spread as identified in the Note may not be changed during the life of the Loan without the written agreement of the Borrower.

For variable rate loans, the interest rate adjustment period may not be changed without the written consent of the Borrower.

Lender must adjust the payment amount at least annually as needed to amortize principal over the remaining term of the note.

If SBA purchases the guaranteed portion of the unpaid principal balance, the interest rate becomes fixed at the rate in effect at the time of the earliest uncured payment default. If there is no uncured payment default, the rate becomes fixed at the rate in effect at the time of purchase.

**Loan Prepayment:**

Notwithstanding any provision in this Note to the contrary:

Borrower may prepay this Note. Borrower may prepay 20 percent or less of the unpaid principal balance at any time without notice. If Borrower prepays more than 20 percent and the Loan has been sold on the secondary market, Borrower must:

a. Give Lender written notice;
b. Pay all accrued interest; and
c. If the prepayment is received less than 21 days from the date Lender receives the notice, pay an amount equal to 21 days' interest from the date lender receives the notice, less any interest accrued during the 21 days and paid under subparagraph b., above.

If Borrower does not prepay within 30 days from the date Lender receives the notice, Borrower must give Lender a new notice.

All remaining principal and accrued interest is due and payable 10 years from date of Note.

Late Charge: If a payment on this Note is more than 10 days late, Lender may charge Borrower a late fee of up to 5.00% of the unpaid portion of the regularly scheduled payment.

4.   DEFAULT:

Borrower is in default under this Note if Borrower does not make a payment when due under this Note, or if Borrower or Operating Company:

A.   Fails to do anything required by this Note and other Loan Documents;
B.   Defaults on any other loan with Lender;
C.   Does not preserve, or account to Lender's satisfaction for, any of the Collateral or its proceeds;
D.   Does not disclose, or anyone acting on their behalf does not disclose, any material fact to Lender or SBA;
E.   Makes, or anyone acting on their behalf makes, a materially false or misleading representation to Lender or SBA;
F.   Defaults on any loan or agreement with another creditor, if Lender believes the default may materially affect Borrower's ability to pay this Note;
G.   Fails to pay any taxes when due;
H.   Becomes the subject of a proceeding under any bankruptcy or insolvency law;
I.   Has a receiver or liquidator appointed for any part of their business or property;
J.   Makes an assignment for the benefit of creditors;
K.   Has any adverse change in financial condition or business operation that Lender believes may materially affect Borrower's ability to pay this Note;
L.   Reorganizes, merges, consolidates, or otherwise changes ownership or business structure without Lender's prior written consent; or
M.   Becomes the subject of a civil or criminal action that Lender believes may materially affect Borrower's ability to pay this Note.

5.   LENDER'S RIGHTS IF THERE IS A DEFAULT:

Without notice or demand and without giving up any of its rights, Lender may:

A.   Require immediate payment of all amounts owing under this Note;
B.   Collect all amounts owing from any Borrower or Guarantor;
C.   File suit and obtain judgment;
D.   Take possession of any Collateral; or
E.   Sell, lease, or otherwise dispose of, any Collateral at public or private sale, with or without advertisement.

6.   LENDER'S GENERAL POWERS:

Without notice and without Borrower's consent, Lender may:

A.   Bid on or buy the Collateral at its sale or the sale of another lienholder, at any price it chooses;
B.   Incur expenses to collect amounts due under this Note, enforce the terms of this Note or any other Loan Document, and preserve or dispose of the Collateral. Among other things, the expenses may include payments for property taxes, prior liens, insurance, appraisals, environmental remediation costs, and reasonable attorney's fees and costs. If Lender incurs such expenses, it may demand immediate repayment from Borrower or add the expenses to the principal balance;
C.   Release anyone obligated to pay this Note;
D.   Compromise, release, renew, extend or substitute any of the Collateral; and
E.   Take any action necessary to protect the Collateral or collect amounts owing on this Note.

7.   WHEN FEDERAL LAW APPLIES:

When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law.

8.   SUCCESSORS AND ASSIGNS:

Under this Note, Borrower and Operating Company include the successors of each, and Lender includes its successors and assigns.

9.   GENERAL PROVISIONS:

A.   All individuals and entities signing this Note are jointly and severally liable.

B.   Borrower waives all suretyship defenses.

C.   Borrower must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or maintain Lender's liens on Collateral.

D.   Lender may exercise any of its rights separately or together, as many times and in any order it chooses. Lender may delay or forgo enforcing any of its rights without giving up any of them.

E.   Borrower may not use an oral statement of Lender or SBA to contradict or alter the written terms of this Note.

F.   If any part of this Note is unenforceable, all other parts remain in effect.

G.   To the extent allowed by law, Borrower waives all demands and notices in connection with this Note, including presentment, demand, protest, and notice of dishonor. Borrower also waives any defenses based upon any claim that Lender did not obtain any guarantee; did not obtain, perfect, or maintain a lien upon Collateral; impaired Collateral; or did not obtain the fair market value of Collateral at a sale.

10. STATE-SPECIFIC PROVISIONS:

None

11. BORROWER'S NAME(S) AND SIGNATURE(S):

By signing below, each individual or entity becomes obligated under this Note as Borrower.

BORROWER: Bancroft Holding LLC

By ______________________ Date 7/6/2024
Scott Duncan, Manager of Bancroft Holding LLC

DocuSign Envelope ID: 11EC3F13-95DC-4F42-8CBE-ED706DEE8FDE

ALLONGE TO SBA TERM NOTE
(76102894974)

This Allonge is for the purpose of amending the terms and conditions, as contained in a certain SBA Term Note in the original principal amount of $3,100,000.00 dated July 6,2018 from Bancroft Holding LLC to Avidia Bank, having a principal office at 42 Main Street, Hudson, Massachusetts. The Note is hereby amended to modify the terms as follows:

1. Commencing March 23, 2020 payments of principal and interest shall be deferred through June 5, 2020.

2. Monthly payments of principal and interest shall commence on July 5, 2020.

3. This modification will affect the original amortization of the principal balance and result in a larger final principal payment.

Nothing in the Allonge shall in any way impair the Note or security granted therefor, or alter, or in any way, vary or affect any provision therein, it being the intent that the Loan Documents and Note shall continue in full force and effect, except as modified herein.

*This [Allonge to 76102894974] is being created and will be stored electronically. When you sign this [Allonge to 76102894974 electronically, you are agreeing that this document is a "transferable record" for purposes of the laws governing electronic transactions. The Bank has the right to control the transferable record. Your electronic signature on this [Allonge to 76102894974 will have the same effect as if you had signed it on paper.*

Signed as an instrument under seal this 23rd, day of March 2020.

Bancroft Holding LLC

DocuSigned by:

By: Scott Duncan

Scott Duncan, Manager

DocuSign Envelope ID: 2E4A1955-A40E-44B9-AE87-C68D6D6E174E

ALLONGE
MODIFYING NOTE

WHEREAS, undersigned Borrower did make and execute a certain Promissory Note dated July 6, 2018 in favor of Avidia Bank, pursuant to an Authorization for a loan to undersigned Borrower issued by Avidia Bank and the SMALL BUSINESS ADMINISTRATION under Docket No. 27262870-06 and Lender Note No. 76102894974, said Note being in the principal amount of $ 3,100,000.00, which said Note contained various recitations concerning the payment of periodic installments of principal and interest;

WHEREAS, the undersigned have agreed to the following changes in the provisions of the said Note:

a) The maturity date has been extended to October 5, 2031. The payment amount will be $26,696.00 beginning with the November 5, 2021 payment.

WHEREAS, the parties mutually acknowledge and agree that the present unpaid and outstanding principal balance on said Note is $2,404,614.55 as of the date hereof.

WHEREAS, undersigned Borrower and Avidia Bank desire that the terms of said Note be modified to affect such change,

NOW THEREFORE, it is mutually agreed by and between the undersigned parties hereto said Note be, and the same hereby is deemed modified in accordance with the provisions herein contained.

IT IS FURTHER UNDERSTOOD AND AGREED by and between the undersigned parties hereto that all other terms and provisions of said Note shall remain in full force and effect.

EXECUTED this 19 of October, 2021.

Lender: Avidia Bank

DocuSigned by:

By: Joseph Sova
Joseph G. Sova

Its: Senior Vice President

Borrower(s): Bancroft Holding LLC

DocuSigned by:

By: Scott Duncan
Scott Duncan

Its: Manager

The undersigned guarantees the obligations of Bancroft Holding LLC (Borrower(s)) contained in the Promissory Note dated July 6, 2018, in the original principal amount of $3,100,000.00 as modified by the Allonge set forth above and consents to the changes noted herein.

Guarantor: Scott Duncan

DocuSigned by:

Scott Duncan

Scott Duncan, Individually

# LOAN AND SECURITY AGREEMENT

This LOAN AND SECURITY AGREEMENT (this "Agreement") is entered into at Hudson, Massachusetts, as of **July 6, 2018**, between **Bancroft Holding LLC, a Massachusetts limited liability company**, with its chief executive office located at **39 Pequossette St, Watertown, Massachusetts 02472** (the "Borrower") and Avidia Bank, a savings bank, with an address of 42 Main Street, Hudson, Massachusetts 01749 (the "Bank").

FOR VALUE RECEIVED, and in consideration of the granting by the Bank of financial accommodations to or for the benefit of the Borrower, including without limitation respecting the Obligations (as hereinafter defined), the Borrower represents to and agrees with the Bank, as of the date hereof and as of the date of each loan, credit and/or other financial accommodation, as follows:

## 1. THE LOAN

1.1 Loan. Subject to the terms and conditions of this Agreement, the Bank hereby agrees to make a loan to Borrower in the original principal amount of **$3,100,000.00** (the "Loan"). The Loan shall be evidenced by that certain SBA Promissory Note, of even date herewith (the "Note") by Bancroft Holding LLC in favor of the Bank in the original principal amount of **$3,100,000.00.** This Agreement, the Note, and any and all other documents, amendments or renewals executed and delivered in connection with any of the foregoing are collectively hereinafter referred to as the "Loan Documents".

## 2. GRANT OF SECURITY INTEREST

2.1 Grant of Security Interest. In consideration of the Bank's extending credit and other financial accommodations to or for the benefit of the Borrower, the Borrower hereby grants to the Bank a security interest in, a lien on and pledge and assignment of the Collateral (as hereinafter defined). The security interest granted by this Agreement is given to and shall be held by the Bank as security for the payment and performance of all Obligations, including, without limitation, all amounts outstanding pursuant to the Loan Documents.

2.2 *SBA Loan. The loan secured by this Agreement was made under a United States Small Business Administration ("SBA") nationwide program which uses tax dollars to assist small business owners. If the United States is seeking to enforce this Agreement, then under the SBA regulations:*

(a) *When SBA is the holder of the Note, this Agreement and all documents evidencing or securing the loan evidenced by the Note will be construed in accordance with federal law.*

(b) *Bank or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using those procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability. No borrower or guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to the loan evidenced by the Note.*

*Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this Agreement.*

2.3 Definitions. The following definitions shall apply:

(a) "Code" shall mean the Massachusetts Uniform Commercial Code, General Laws, Chapter 106 as amended from time to time.

(b) "Collateral" shall mean all of the Borrower's present and future right, title and interest in and to any and all of the personal property of the Borrower whether such property is now existing or hereafter created, acquired or arising and wherever located from time to time, including without limitation:

(i) accounts;

(ii) each of the vehicles listed in one or more of the following paragraphs;

(iii) 2008 Ford Ranger - Vehicle Identification No. 1FDR10D56TA77953;

(iv) 2011 Ford F-350 - Vehicle Identification No. 1FD2F3H68BEA33412;

(v) 2008 Ford Explorer - Vehicle Identification No. 1FMEU51EX8UA60384;

(vi) chattel paper;

(vii) goods;

(viii) inventory;

(ix) equipment;

(x) fixtures

(xi) farm products;

(xii) instruments;

(xiii) investment property;

(xiv) documents;

(xv) commercial tort claims;

(xvi) deposit accounts;

(xvii) letter-of-credit rights;

(xviii) general intangibles;

(xix) supporting obligations; and

(xx) records of, accession to and proceeds and products of the foregoing.

(c) "Debtors" shall mean the Borrower's customers who are indebted to the Borrower.

(d) "Obligation(s)" shall mean, without limitation, all loans, advances, indebtedness, notes, liabilities and amounts, liquidated or unliquidated, owing by the Borrower to the Bank at any time, of each and every kind, nature and description, whether arising under this Agreement or

otherwise, and whether secured or unsecured, direct or indirect (that is, whether the same are due directly by the Borrower to the Bank; or are due indirectly by the Borrower to the Bank as endorser, guarantor or other surety, or as borrower of obligations due third persons which have been endorsed or assigned to the Bank, or otherwise), absolute or contingent, due or to become due, now existing or hereafter arising or contracted, including, without limitation, payment when due of all amounts outstanding respecting any of the Loan Documents. Said term shall also include all interest and other charges chargeable to the Borrower or due from the Borrower to the Bank from time to time and all costs and expenses referred to in this Agreement.

(e) "Person" or "party" shall mean individuals, partnerships, corporations, limited liability companies and all other entities.

All words and terms used in this Agreement other than those specifically defined herein shall have the meanings accorded to them in the Code.

2.4 Ordinary Course of Business. The Bank hereby authorizes and permits the Borrower to hold, process, sell, use or consume in the manufacture or processing of finished goods, or otherwise dispose of inventory for fair consideration, all in the ordinary course of the Borrower's business, excluding, without limitation, sales to creditors or in bulk or sales or other dispositions occurring under circumstances which would or could create any lien or interest adverse to the Bank's security interest or other right hereunder in the proceeds resulting therefrom. The Bank also hereby authorizes and permits the Borrower to receive from the Debtors all amounts due as proceeds of the Collateral at the Borrower's own cost and expense, and also liability, if any, subject to the direction and control of the Bank at all times; and the Bank may at any time, without cause or notice, and whether or not an Event of Default has occurred or demand has been made, terminate all or any part of the authority and permission herein or elsewhere in this Agreement granted to the Borrower with reference to the Collateral, and notify Debtors to make all payments due as proceeds of the Collateral to the Bank. Until Bank shall otherwise notify Borrower, all proceeds of and collections of Collateral shall be retained by Borrower and used solely for the ordinary and usual operation of Borrower's business. From and after notice by Bank to Borrower, all proceeds of and collections of the Collateral shall be held in trust by Borrower for Bank and shall not be commingled with Borrower's other funds or deposited in any Bank account of Borrower; and Borrower agrees to deliver to Bank on the dates of receipt thereof by Borrower, duly endorsed to Bank or to bearer, or assigned to Bank, as may be appropriate, all proceeds of the Collateral in the identical form received by Borrower.

2.5 Allowances. Absent an Event of Default the Borrower may grant such allowances or other adjustments to Debtors (exclusive of extending the time for payment of any item which shall not be done without first obtaining the Bank's written consent in each instance) as the Borrower may reasonably deem to accord with sound business practice, including, without limiting the generality of the foregoing, accepting the return of all or any part of the inventory (subject to the provisions set forth in this Agreement with reference to returned inventory).

2.6 Records. The Borrower shall hold its books and records relating to the Collateral segregated from all the Borrower's other books and records in a manner satisfactory to the Bank; and shall deliver to the Bank from time to time promptly at its request all invoices, original documents of title, contracts, chattel paper, instruments and any other writings relating thereto, and other evidence of performance of contracts, or evidence of shipment or delivery of the merchandise or of the rendering of services; and the Borrower will deliver to the Bank promptly at the Bank's request from time to time additional copies of any or all of such papers or writings, and such other information with respect to any of the Collateral and such schedules of inventory, schedules of accounts and such other writings as the Bank may in its sole discretion deem to be necessary or effectual to evidence any loan hereunder or the Bank's security interest in the Collateral.

2.7 Legends. The Borrower shall promptly make, stamp or record such entries or legends on the Borrower's books and records or on any of the Collateral (including, without limitation, chattel paper) as Bank shall request from time to time, to indicate and disclose that Bank has a security interest in such Collateral.

2.8 Inspection. The Bank, or its representatives, at any time and from time to time, shall have the right at the sole cost and expense of Borrower, and the Borrower will permit the Bank and/or its representatives: (a) to examine, check, make copies of or extracts from any of the Borrower's books, records and files (including, without limitation, orders and original correspondence); (b) to perform field exams or otherwise inspect and examine the Collateral and to check, test or appraise the same as to quality, quantity, value and condition; and (c) to verify the Collateral or any portion or portions thereof or the Borrower's compliance with the provisions of this Agreement.

2.9 Purchase Money Security Interests. To the extent the Borrower uses proceeds of any loans to purchase Collateral, the repayment of such loans shall be on a "first-in-first-out" basis so that the portion of the loan used to purchase a particular item of Collateral shall be repaid in the order in which Borrower purchased such item of Collateral.

2.10 Search Reports. Bank shall receive prior to the date of this Agreement UCC search results under all names used by the Borrower during the prior five (5) years, from each jurisdiction where any Collateral is located, from the State, if any, where the Borrower is organized and registered (as such terms are used in the Code), and the State where the Borrower's chief executive office is located. The search results shall confirm that the security interest in the Collateral granted Bank hereunder is prior to all other security interests in favor of any other person.

## 3. REPRESENTATIONS AND WARRANTIES

3.1 Organization and Qualification. Borrower is a duly organized and validly existing limited liability company under the laws of the State of its formation, with the exact legal name set forth in the first paragraph of this Agreement. Borrower is in good standing under the laws of said State, has the power to own its property and conduct its business as now conducted and as currently proposed to be conducted, and is duly qualified to do business under the laws of each state where the nature of the business done or property owned requires such qualification.

3.2 Related Parties. Borrower has no interest in any entities other than those listed on Schedule 3.2, if any, and the Borrower has never consolidated, merged or acquired substantially all of the assets of any other entity or person other than those listed on Schedule 3.2, if any.

3.3 Limited Liability Company Records. Borrower's certificate of organization, articles of organization or other charter document and all amendments thereto have been duly filed and are in proper order. All members of the Borrower are properly reflected on all books and records of the Borrower, including but not limited to its operating agreement, minute books, bylaws and books of account, all of which are accurate and up to date and will be so maintained.

3.4 Title to Properties; Absence of Liens. Borrower has good and clear record and marketable title to all of its properties and assets, and all of its properties and assets including the Collateral are free and clear of all mortgages, liens, pledges, charges, encumbrances and setoffs, other than the security interest therein granted to the Bank and (a) the mortgages, deeds of trust and security interests as set forth on Schedule 3.4, if any, and (b) the leases of personal property as set forth on Schedule 3.4, if any.

3.5 Places of Business. Borrower's chief executive office is correctly stated in the preamble to this Agreement, and Borrower shall, during the term of this Agreement, keep the Bank currently and accurately informed in writing of each of its other places of business, and shall not change the location of such chief executive office or open or close, move or change any existing or new place of business without giving the Bank at least thirty (30) days prior written notice thereof.

3.6 Valid Obligations. The execution, delivery and performance of the Loan Documents have been duly authorized by all necessary action and each represents a legal, valid and binding obligation of Borrower and is fully enforceable according to its terms, except as limited by equity or laws relating to the enforcement of creditors' rights.

3.7 Conflicts. There is no provision in Borrower's organizational or charter documents, if any, or in any indenture, contract or agreement to which Borrower is a party which prohibits, limits or restricts the execution, delivery or performance of the Loan Documents.

3.8 Governmental Approvals. The execution, delivery and performance of the Loan Documents does not require any approval of or filing with any governmental agency or authority.

3.9 Litigation, etc. There are no actions, claims or proceedings pending or to the knowledge of Borrower threatened against Borrower which might materially adversely affect the ability of Borrower to conduct its business or to pay or perform the Obligations.

3.10 Financial Statements. The Borrower has furnished to the Bank the following Financial Statements (the "Financial Statements"): balance sheet as of **December 31, 2017**, and statement of profit and loss for the period ending **December 31, 2017**. The balance sheet fairly presents the condition of the Borrower at the date thereof and the statement of profit and loss fairly presents the results of the operations of the Borrower for the period indicated, all in conformity with generally accepted accounting principles, consistently applied.

3.11 Accounts and Contract Rights. All accounts arise out of legally enforceable and existing contracts, and represent unconditional and undisputed bona fide indebtedness by a Debtor, and are not and will not be subject to any discount (except such cash or trade discount as may be shown on any invoice, contract or other writing delivered to the Bank). No contract right, account, general intangible or chattel paper is or will be represented by any note or other instrument, and no contract right, account or general intangible is, or will be represented by any conditional or installment sales obligation or other chattel paper, except such instruments or chattel paper as have been or immediately upon receipt by the Borrower will be delivered to the Bank (duly endorsed or assigned), such delivery, in the case of chattel paper, to include all executed copies except those in the possession of the installment buyer and any security for or guaranty of any of the Collateral shall be delivered to the Bank immediately upon receipt thereof by the Borrower, with such assignments and endorsements thereof as the Bank may request.

3.12 Title to Collateral. At the date hereof the Borrower is (and as to Collateral that the Borrower may acquire after the date hereof, will be) the lawful owner of the Collateral, and the Collateral and each item thereof is, will be and shall continue to be free of all restrictions, liens, encumbrances or other rights, title or interests (other than the security interest therein granted to the Bank), credits, defenses, recoupments, set-offs or counterclaims whatsoever excepting those items listed on Schedule 3.4. The Borrower has and will have full power and authority to grant to the Bank a security interest in the Collateral and the Borrower has not transferred, assigned, sold, pledged, encumbered, subjected to lien or granted any security interest in, and will not transfer, assign, sell (except sales or other dispositions in the ordinary course of business in respect to inventory as expressly permitted in this Agreement), pledge, encumber, subject to lien or grant any security interest in any of the Collateral (or any of the Borrower's right, title or interest therein), to any person other than the Bank. The Collateral is and will be valid and genuine in all respects. The Borrower will warrant and defend the Bank's right to and interest in the Collateral against all claims and demands of all persons whatsoever.

3.13 Location of Collateral. Except for sale, processing, use, consumption or other disposition in the ordinary course of business, the Borrower will keep all inventory and equipment only at locations specified in this Agreement or specified to the Bank in writing. The Borrower shall, during the term of this Agreement, keep the Bank currently and accurately informed in writing of each location where the Borrower's records relating to its accounts and contract rights, respectively, are kept, and shall not

remove such records or any of them to another location without giving the Bank at least thirty (30) days prior written notice thereof.

3.14 Third Parties. The Bank shall not be deemed to have assumed any liability or responsibility to the Borrower or any third person for the correctness, validity or genuineness of any instruments or documents that may be released or endorsed to the Borrower by the Bank (which shall automatically be deemed to be without recourse to the Bank in any event) or for the existence, character, quantity, quality, condition, value or delivery of any goods purporting to be represented by any such documents; and the Bank, by accepting such security interest in the Collateral, or by releasing any Collateral to the Borrower, shall not be deemed to have assumed any obligation or liability to any supplier or Debtor or to any other third party, and the Borrower agrees to indemnify and defend the Bank and hold it harmless in respect to any claim or proceeding arising out of any matter referred to in this paragraph.

3.15 Payment of Accounts. Each account or other item of Collateral, other than inventory and equipment, will be paid in full on or before the date shown as its due date in the schedule of Collateral, in the copy of the invoice(s) relating to the account or other Collateral or in contracts relating thereto. Upon any suspension of business, assignment or trust mortgage for the benefit of creditors, dissolution, petition in receivership or under any chapter of the Bankruptcy Code as amended from time to time by or against any Debtor, any Debtor becoming insolvent or unable to pay its debts as they mature or any other act of the same or different nature amounting to a business failure, the Borrower will immediately notify the Bank thereof.

3.16 Changes. Since the date of the Financial Statements, there have been no changes in the assets, liabilities, financial condition or business of the Borrower, other than changes in the ordinary course of business, the effect of which have, in the aggregate, been materially adverse.

3.17 Taxes. The Borrower has filed all Federal, state and other tax returns required to be filed (except for such returns for which current and valid extensions have been filed), and all taxes, assessments and other governmental charges due from the Borrower have been fully paid. The Borrower has established on its books reserves adequate for the payment of all Federal, state and other tax liabilities (if any).

3.18 Use of Proceeds. No portion of any loan is to be used for (i) the purpose of purchasing or carrying any "margin security" or "margin stock" as such terms are used in Regulations U and X of the Board of Governors of the Federal Reserve System, 12 C.F.R. 221 and 224 or (ii) primarily personal, family or household purposes. The Collateral is not used or acquired primarily for personal, family or household purposes.

3.19 Environmental. As of the date hereof neither the Borrower nor any of Borrower's agents, employees or independent contractors (1) have caused or are aware of a release or threat of release of Hazardous Materials (as defined herein) on any of the premises or personal property owned or controlled by Borrower ("Controlled Property") or any property abutting Controlled Property ("Abutting Property"), which could give rise to liability under any Environmental Law (as defined herein) or any other Federal, state or local law, rule or regulation; (2) have arranged for the transport of or transported any Hazardous Materials in a manner as to violate, or result in potential liabilities under, any Environmental Law; (3) have received any notice, order or demand from the Environmental Protection Agency or any other Federal, state or local agency under any Environmental Law; (4) have incurred any liability under any Environmental Law in connection with the mismanagement, improper disposal or release of Hazardous Materials; or (5) are aware of any inspection or investigation of any Controlled Property or Abutting Property by any Federal, state or local agency for possible violations of any Environmental Law.

To the best of Borrower's knowledge, neither Borrower, nor any prior owner or tenant of any Controlled Property, committed or omitted any act which caused the release of Hazardous Materials on such Controlled Property which could give rise to a lien thereon by any Federal, state or local government. No notice or statement of claim or lien affecting any Controlled Property has been recorded or filed in any public records by any Federal, state or local government for costs, penalties, fines or other

charges as to such property. All notices, permits, licenses or similar authorizations, if any, required to be obtained or filed in connection with the ownership, operation, or use of the Controlled Property, including without limitation, the past or present generation, treatment, storage, disposal or release of any Hazardous Materials into the environment, have been duly obtained or filed.

Borrower agrees to indemnify and hold the Bank harmless from all liability, loss, cost, damage and expense, including attorney fees and costs of litigation, arising from any and all of its violations of any Environmental Law (including those arising from any lien by any Federal, state or local government arising from the presence of Hazardous Materials) or from the presence of Hazardous Materials located on or emanating from any Controlled Property or Abutting Property whether existing or not existing and whether known or unknown at the time of the execution hereof and regardless of whether or not caused by, or within the control of Borrower. Borrower further agrees to reimburse Bank upon demand for any costs incurred by Bank in connection with the foregoing. Borrower agrees that its obligations hereunder shall be continuous and shall survive the repayment of all debts to Bank and shall continue so long as a valid claim may be lawfully asserted against the Bank.

The term "Hazardous Materials" includes but is not limited to any and all substances (whether solid, liquid or gas) defined, listed, or otherwise classified as pollutants, hazardous wastes, hazardous substances, hazardous materials, extremely hazardous wastes, or words of similar meaning or regulatory effect under any present or future Environmental Law or that may have a negative impact on human health or the environment, including but not limited to petroleum and petroleum products, asbestos and asbestos-containing materials, polychlorinated biphenyls, lead, radon, radioactive materials, flammables and explosives.

The term "Environmental Law" means any present and future Federal, state and local laws, statutes, ordinances, rules, regulations and the like, as well as common law, relating to protection of human health or the environment, relating to Hazardous Materials, relating to liability for or costs of remediation or prevention of releases of Hazardous Materials or relating to liability for or costs of other actual or threatened danger to human health or the environment. The term "Environmental Law" includes, but is not limited to, the following statutes, as amended, any successor thereto, and any regulations promulgated pursuant thereto, and any state or local statutes, ordinances, rules, regulations and the like addressing similar issues: the Comprehensive Environmental Response, Compensation and Liability Act; the Emergency Planning and Community Right-to-Know Act; the Hazardous Materials Transportation Act; the Resource Conservation and Recovery Act (including but not limited to Subtitle I relating to underground storage tanks); the Solid Waste Disposal Act; the Clean Water Act; the Clean Air Act; the Toxic Substances Control Act; the Safe Drinking Water Act; the Occupational Safety and Health Act; the Federal Water Pollution Control Act; the Federal Insecticide, Fungicide and Rodenticide Act; the Endangered Species Act; the National Environmental Policy Act; the River and Harbors Appropriation Act and the Massachusetts Hazardous Waste Management Act, M.G.L. Chapter 21C, and the Massachusetts Oil and Hazardous Material Release Prevention and Response Act, M.G.L. Chapter 21E.

## 4. AFFIRMATIVE COVENANTS

4.1 Payments and Performance. Borrower will duly and punctually pay all Obligations becoming due to the Bank and will duly and punctually perform all Obligations on its part to be done or performed under this Agreement.

4.2 Books and Records; Inspection. Borrower will at all times keep proper books of account in which full, true and correct entries will be made of its transactions in accordance with generally accepted accounting principles, consistently applied and which are, in the opinion of a Certified Public Accountant acceptable to Bank, adequate to determine fairly the financial condition and the results of operations of Borrower. Borrower will at all reasonable times make its books and records available in its offices for inspection, examination and duplication by the Bank and the Bank's representatives and will permit inspection of the Collateral and all of its properties by the Bank and the Bank's representatives. Borrower will from time to time furnish the Bank with such information and statements as the Bank may request in


its sole discretion with respect to the Obligations or the Bank's security interest in the Collateral. Borrower shall, during the term of this Agreement, keep the Bank currently and accurately informed in writing of each location where Borrower's records relating to its accounts and contract rights are kept, and shall not remove such records to another location without giving the Bank at least thirty (30) days prior written notice thereof.

4.3 Financial Statements. Borrower will furnish to Bank:

(a) within 30 days after the close of each quarterly fiscal period of Borrower, an Accounts Receivable aging report in form satisfactory to Bank showing the total amount due from each account debtor, the month in which each Account Receivable was created, as well as such other information as Bank shall request;

(b) within 30 days of quarter end, a balance sheet and profit & loss statement will be provided to the Bank.

(c) Borrower's filed Federal tax returns, including all schedules thereto, for the prior year within 120 days after the date that Borrower's tax returns are required to be filed each such year or by such other date approved by the Bank;

(d) from time to time, such financial data and information about Borrower as Bank may reasonably request; and

(e) any financial data and information about any guarantors of the Obligations as Bank may reasonably request.

4.4 Conduct of Business. The Borrower will maintain its existence in good standing and comply with all laws and regulations of the United States and of any state or states thereof and of any political subdivision thereof, and of any governmental authority which may be applicable to it or to its business; provided that this covenant shall not apply to any tax, assessment or charge which is being contested in good faith and with respect to which reserves have been established and are being maintained.

4.5 Notice to Account Debtors. The Borrower agrees, at the request of the Bank, to notify all or any of the Debtors in writing of the Bank's security interest in the Collateral in whatever manner the Bank requests and, hereby authorizes the Bank to notify all or any of the Debtors of the Bank's security interest in the Borrower's accounts at the Borrower's expense.

4.6 Contact with Accountant. The Borrower hereby authorizes the Bank to directly contact and communicate with any accountant employed by Borrower in connection with the review and/or maintenance of Borrower's books and records or preparation of any financial reports delivered by or at the request of Borrower to Bank.

4.7 Operating and Deposit Accounts. The Borrower shall maintain with the Bank its primary operating and deposit accounts. At the option of the Bank, all loan payments and fees will automatically be debited from the Borrower's primary operating account and all advances will automatically be credited to the Borrower's primary operating account.

4.8 Taxes. Borrower will promptly pay all real and personal property taxes, assessments and charges and all franchise, income, unemployment, retirement benefits, withholding, sales and other taxes assessed against it or payable by it before delinquent; provided that this covenant shall not apply to any tax assessment or charge which is being contested in good faith and with respect to which reserves have been established and are being maintained. The Bank may, at its option, from time to time, discharge any taxes, liens or encumbrances of any of the Collateral, and the Borrower will pay to the Bank on demand or the Bank in its sole discretion may charge to the Borrower all amounts so paid or incurred by it.

4.9 Maintenance. Borrower will keep and maintain the Collateral and its other properties, if any, in good repair, working order and condition. Borrower will immediately notify the Bank of any loss or damage to or any occurrence which would adversely affect the value of any Collateral. The Bank may, at its option, from time to time, take any other action that the Bank may deem proper to repair, maintain or preserve any of the Collateral, and the Borrower will pay to the Bank on demand or the Bank in its sole discretion may charge to the Borrower all amounts so paid or incurred by it.

4.10 Insurance. Borrower will maintain in force property and casualty insurance on all Collateral and any other property of the Borrower, if any, against risks customarily insured against by companies engaged in businesses similar to that of the Borrower containing such terms and written by such companies as may be satisfactory to the Bank, such insurance to be payable to the Bank as its interest may appear in the event of loss and to name the Bank as insured pursuant to a standard loss payee clause; no loss shall be adjusted thereunder without the Bank's approval; and all such policies shall provide that they may not be canceled without first giving at least Thirty (30) days written notice of cancellation to the Bank. In the event that the Borrower fails to provide evidence of such insurance, the Bank may, at its option, secure such insurance and charge the cost thereof to the Borrower. At the option of the Bank, all insurance proceeds received from any loss or damage to any of the Collateral shall be applied either to the replacement or repair thereof or as a payment on account of the Obligations. From and after the occurrence of an Event of Default, the Bank is authorized to cancel any insurance maintained hereunder and apply any returned or unearned premiums, all of which are hereby assigned to the Bank, as a payment on account of the Obligations.

4.11 Notification of Default. Immediately upon becoming aware of the existence of any condition or event which constitutes an Event of Default, or any condition or event which would upon notice or lapse of time, or both, constitute an Event of Default, Borrower shall give Bank written notice thereof specifying the nature and duration thereof and the action being or proposed to be taken with respect thereto.

4.12 Notification of Material Litigation. Borrower will immediately notify the Bank in writing of any litigation or of any investigative proceedings of a governmental agency or authority commenced or threatened against it which would or might be materially adverse to the financial condition of Borrower or any guarantor of the Obligations.

4.13 Pension Plans. With respect to any pension or benefit plan maintained by Borrower, or to which Borrower contributes ("Plan"), the benefits under which are guarantied, in whole or in part, by the Pension Benefit Guaranty Corporation created by the Employee Retirement Income Security Act of 1974, P.L. 93-406, as amended ("ERISA") or any governmental authority succeeding to any or all of the functions of the Pension Benefit Guaranty Corporation ("Pension Benefit Guaranty Corporation"), Borrower will (a) fund each Plan as required by the provisions of Section 412 of the Internal Revenue Code of 1986, as amended; (b) cause each Plan to pay all benefits when due; (c) furnish Bank (i) promptly with a copy of any notice of each Plan's termination sent to the Pension Benefit Guaranty Corporation (ii) no later than the date of submission to the Department of Labor or to the Internal Revenue Service, as the case may be, a copy of any request for waiver from the funding standards or extension of the amortization periods required by Section 412 of the Internal Revenue Code of 1986, as amended and (iii) notice of any Reportable Event as such term is defined in ERISA; and (d) subscribe to any contingent liability insurance provided by the Pension Benefit Guaranty Corporation to protect against employer liability upon termination of a guarantied pension plan, if available to Borrower.

## 5. NEGATIVE COVENANTS

5.1 Financial Covenants. The Borrower will not at any time or during any fiscal period (as applicable) fail to be in compliance with any of the financial covenants in this section.

(a) Definitions: The following definitions shall apply to this Section:

(i) "GAAP" shall mean generally accepted accounting principles in effect from time to time in

the United States.

(b)   Cash Flow Leverage.  A cash flow leverage of <=4 shall be required for the life of the loan and tested annually beginning December 31, 2018.

(c)   Pre-Distribution Combined Debt Service Coverage Ratio.  A Pre-distribution CDSCR of >= 1.25x shall be required for the life of the loan and tested annually beginning December 31, 2018.

(d)   Post Distribution Combined Debt Service Coverage Ratio.  A Post-Distribution CDSCR of >=1.10x shall be required for the life of the loan and tested annually beginning December 31, 2018.

5.2   Limitations on Indebtedness.  Borrower shall not issue any evidence of indebtedness or create, assume, guarantee, become contingently liable for, or suffer to exist indebtedness in addition to indebtedness to the Bank, except indebtedness or liabilities of Borrower, other than for money borrowed, incurred or arising in the ordinary course of business and excepting those items listed on Schedule 3.4.

5.3   Sale of Interest.  There shall not be any sale or transfer of ownership of any interest in the Borrower without the Bank's prior written consent.

5.4   Loans or Advances.  Borrower shall not make any loans or advances to any individual, partnership, corporation, limited liability company, trust, or other organization or person, including without limitation its officers and employees; provided, however, that Borrower may make advances to its employees, including its members, officers, with respect to expenses incurred or to be incurred by such employees in the ordinary course of business which expenses are reimbursable by Borrower; and provided further, however, that Borrower may extend credit in the ordinary course of business in accordance with customary trade practices.

5.5   Distributions.  Borrower shall not, without prior written permission of the Bank, make any distribution to any of Borrower's members or managers in cash or in property or redeem, purchase or otherwise acquire, directly or indirectly, any interests, provided, so long as Borrower is not in default hereunder, distributions to the members of Borrower in such amounts as are necessary to pay the tax liability of such members due as a result of such members interest in the Borrower.

5.6   Investments.  The Borrower shall not make investments in, or advances to, any individual, partnership, corporation, limited liability company, trust or other organization or person. The Borrower will not purchase or otherwise invest in or hold securities, nonoperating real estate or other nonoperating assets or purchase all or substantially all the assets of any entity.

5.7   Merger.  Borrower shall not merge or consolidate or be merged or consolidated with or into any other entity.

5.8   Capital Expenditures.  The Borrower shall not, directly or indirectly, make or commit to make capital expenditures by lease, purchase, or otherwise, except in the ordinary and usual course of business for the purpose of replacing machinery, equipment or other personal property which, as a consequence of wear, duplication or obsolescence, is no longer used or necessary in the Borrower's business.

5.9   Sale of Assets.  Borrower shall not sell, lease or otherwise dispose of any of its assets, except in the ordinary and usual course of business and except for the purpose of replacing machinery, equipment or other personal property which, as a consequence of wear, duplication or obsolescence, is no longer used or necessary in the Borrower's business, provided that fair consideration is received therefor; provided, however, in no event shall the Borrower sell, lease or otherwise dispose of any equipment purchased with the proceeds of any loans made by the Bank.

5.10 Restriction on Liens. Borrower shall not grant any security interest in, or mortgage of, any of its properties or assets including the Collateral. Borrower shall not enter into any agreement with any person other than the Bank that prohibits the Borrower from granting any security interest in, or mortgage of, any of its properties or assets including the Collateral and excepting those items listed on Schedule 3.4.

5.11 Other Business. Borrower shall not engage in any business other than the business in which it is currently engaged or a business reasonably allied thereto.

5.12 Change of Name, etc. Borrower shall not change its legal name or the State or the type of its formation, without giving the Bank at least 30 days prior written notice thereof.

## 6. DEFAULT

6.1 Default. "Event of Default" shall mean the occurrence of one or more of any of the following events:

(a) default of any liability, obligation, covenant or undertaking of the Borrower or any guarantor of the Obligations to the Bank, hereunder or otherwise, including, without limitation, failure to pay in full and when due any installment of principal or interest or default of the Borrower or any guarantor of the Obligations under any other Loan Document or any other agreement with the Bank;

(b) failure of the Borrower or any guarantor of the Obligations to maintain aggregate collateral security value satisfactory to the Bank;

(c) default of any material liability, obligation or undertaking of the Borrower or any guarantor of the Obligations to any other party;

(d) if any statement, representation or warranty heretofore, now or hereafter made by the Borrower or any guarantor of the Obligations in connection with this Agreement or in any supporting financial statement of the Borrower or any guarantor of the Obligations shall be determined by the Bank to have been false or misleading in any material respect when made;

(e) if the Borrower or any guarantor of the Obligations is a corporation, trust, partnership or limited liability company, the liquidation, termination or dissolution of any such organization, or the merger or consolidation of such organization into another entity, or its ceasing to carry on actively its present business or the appointment of a receiver for its property;

(f) the death of the Borrower or any guarantor of the Obligations and, if the Borrower or any guarantor of the Obligations is a partnership or limited liability company, the death of any partner or member;

(g) the institution by or against the Borrower or any guarantor of the Obligations of any proceedings under the Bankruptcy Code 11 USC §101 *et seq.* or any other law in which the Borrower or any guarantor of the Obligations is alleged to be insolvent or unable to pay its debts as they mature, or the making by the Borrower or any guarantor of the Obligations of an assignment for the benefit of creditors or the granting by the Borrower or any guarantor of the Obligations of a trust mortgage for the benefit of creditors;

(h) the service upon the Bank of a writ in which the Bank is named as trustee of the Borrower or any guarantor of the Obligations;

(i) a judgment or judgments for the payment of money shall be rendered against the Borrower or any guarantor of the Obligations, and any such judgment shall remain unsatisfied and in effect for any period of thirty (30) consecutive days without a stay of execution;

(j) any levy, lien (including mechanics lien), seizure, attachment, execution or similar process shall be issued or levied on any of the property of the Borrower or any guarantor of the Obligations;

(k) the termination or revocation of any guaranty of the Obligations; or

(l) the occurrence of such a change in the condition or affairs (financial or otherwise) of the Borrower or any guarantor of the Obligations, or the occurrence of any other event or circumstance, such that the Bank, in its sole discretion, deems that it is insecure or that the prospects for timely or full payment or performance of any obligation of the Borrower or any guarantor of the Obligations to the Bank has been or may be impaired.

6.2 Acceleration. If an Event of Default shall occur, at the election of the Bank, all Obligations shall become immediately due and payable without notice or demand, except with respect to Obligations payable on DEMAND, which shall be due and payable on DEMAND, whether or not an Event of Default has occurred.

The Bank is hereby authorized, at its election, after an Event of Default or after Demand, without any further demand or notice except to such extent as notice may be required by applicable law, to take possession and/or sell or otherwise dispose of all or any of the Collateral at public or private sale; and the Bank may also exercise any and all other rights and remedies of a secured party under the Code or which are otherwise accorded to it in equity or at law, all as Bank may determine, and such exercise of rights in compliance with the requirements of law will not be considered adversely to affect the commercial reasonableness of any sale or other disposition of the Collateral. If notice of a sale or other action by the Bank is required by applicable law, unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, the Borrower agrees that ten (10) days written notice to the Borrower, or the shortest period of written notice permitted by such law, whichever is smaller, shall be sufficient notice; and that to the extent permitted by law, the Bank, its officers, attorneys and agents may bid and become purchasers at any such sale, if public, and may purchase at any private sale any of the Collateral that is of a type customarily sold on a recognized market or which is the subject of widely distributed standard price quotations. Any sale (public or private) shall be without warranty and free from any right of redemption, which the Borrower shall waive and release after default upon the Bank's request therefor, and may be free of any warranties as to the Collateral if Bank shall so decide. No purchaser at any sale (public or private) shall be responsible for the application of the purchase money. Any balance of the net proceeds of sale remaining after paying all Obligations of the Borrower to the Bank shall be returned to such other party as may be legally entitled thereto; and if there is a deficiency, the Borrower shall be responsible for repayment of the same, with interest. Upon demand by the Bank, the Borrower shall assemble the Collateral and make it available to the Bank at a place designated by the Bank which is reasonably convenient to the Bank and the Borrower. The Borrower hereby acknowledges that the Bank has extended credit and other financial accommodations to the Borrower upon reliance of the Borrower's granting the Bank the rights and remedies contained in this Agreement including without limitation the right to take immediate possession of the Collateral upon the occurrence of an Event of Default or after DEMAND with respect to Obligations payable on DEMAND and the Borrower hereby acknowledges that the Bank is entitled to equitable and injunctive relief to enforce any of its rights and remedies hereunder or under the Code and the Borrower hereby waives any defense to such equitable or injunctive relief based upon any allegation of the absence of irreparable harm to the Bank.

The Bank shall not be required to marshal any present or future security for (including but not limited to this Agreement and the Collateral subject to the security interest created hereby), or guarantees of, the Obligations or any of them, or to resort to such security or guarantees in any particular order; and all of its rights hereunder and in respect of such securities and guaranties shall be cumulative and in addition to all other rights, however existing or arising. To the extent that it lawfully may do so, the Borrower hereby agrees that it will not invoke and irrevocably waives the benefits of any law relating to the marshalling of collateral which might cause delay in or impede the enforcement of the Bank's rights

under this Agreement or under any other instrument evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or guaranteed. Except as required by applicable law, the Bank shall have no duty as to the collection or protection of the Collateral or any income thereon, nor as to the preservation of rights against prior parties, nor as to the preservation of any rights pertaining thereto beyond the safe custody thereof.

6.3 Power of Attorney. The Borrower hereby irrevocably constitutes and appoints the Bank as the Borrower's true and lawful attorney, with full power of substitution, at the sole cost and expense of the Borrower but for the sole benefit of the Bank, upon the occurrence of an Event of Default or after DEMAND with respect to Obligations payable on DEMAND, to convert the Collateral into cash, including, without limitation, completing the manufacture or processing of work in process, and the sale (either public or private) of all or any portion or portions of the Inventory and other Collateral; to enforce collection of the Collateral, either in its own name or in the name of the Borrower, including, without limitation, executing releases or waivers, compromising or settling with any Debtors and prosecuting, defending, compromising or releasing any action relating to the Collateral; to receive, open and dispose of all mail addressed to the Borrower and to take therefrom any remittances or proceeds of Collateral in which the Bank has a security interest; to notify Post Office authorities to change the address for delivery of mail addressed to the Borrower to such address as the Bank shall designate; to endorse the name of the Borrower in favor of the Bank upon any and all checks, drafts, money orders, notes, acceptances or other instruments of the same or different nature; to sign and endorse the name of the Borrower on and to receive as secured party any of the Collateral, any invoices, freight or express receipts, or bills of lading, storage receipts, warehouse receipts, or other documents of title of the same or different nature relating to the Collateral; to sign the name of the Borrower on any notice of the Debtors or on verification of the Collateral; and to sign, if necessary, and file or record on behalf of the Borrower any financing or other statement in order to perfect or protect the Bank's security interest. The Bank shall not be obliged to do any of the acts or exercise any of the powers hereinabove authorized, but if the Bank elects to do any such act or exercise any such power, it shall not be accountable for more than it actually receives as a result of such exercise of power, and it shall not be responsible to the Borrower except for its own gross negligence or willful misconduct. All powers conferred upon the Bank by this Agreement, being coupled with an interest, shall be irrevocable so long as any Obligation of the Borrower or any guarantor or surety to the Bank shall remain unpaid or the Bank is obligated under this Agreement to extend any credit to the Borrower.

6.4 Nonexclusive Remedies. All of the Bank's rights and remedies not only under the provisions of this Agreement but also under any other agreement or transaction shall be cumulative and not alternative or exclusive, and may be exercised by the Bank at such time or times and in such order of preference as the Bank in its sole discretion may determine.

## 7. MISCELLANEOUS

7.1 Waivers. The Borrower waives notice of intent to accelerate, notice of acceleration, notice of nonpayment, demand, presentment, protest or notice of protest of the Obligations, and all other notices, consents to any renewals or extensions of time of payment thereof, and generally waives any and all suretyship defenses and defenses in the nature thereof.

7.2 Waiver of Homestead. To the maximum extent permitted under applicable law, the Borrower hereby waives and terminates any homestead rights and/or exemptions respecting any of its property under the provisions of any applicable homestead laws, including without limitation, Chapter 188, Section 1, of the General Laws of Massachusetts.

7.3 Deposit Collateral. The Borrower hereby grants to the Bank a continuing lien and security interest in any and all deposits or other sums at any time credited by or due from the Bank to the Borrower and any cash, securities, instruments or other property of the Borrower in the possession of the Bank, whether for safekeeping or otherwise, or in transit to or from the Bank (regardless of the reason the Bank had received the same or whether the Bank has conditionally released the same) as security for the full and punctual

payment and performance of all of the liabilities and obligations of the Borrower to the Bank and such deposits and other sums may be applied or set off against such liabilities and obligations of the Borrower to the Bank at any time, whether or not such are then due, whether or not demand has been made and whether or not other collateral is then available to the Bank.

7.4 Indemnification. The Borrower shall indemnify, defend and hold the Bank and its directors, officers, employees, agents and attorneys (each an "Indemnitee") harmless of and from any claim brought or threatened against any Indemnitee by the Borrower, any guarantor or endorser of the Obligations, or any other person (as well as from reasonable attorneys' fees and expenses in connection therewith) on account of the Bank's relationship with the Borrower, or any guarantor or endorser of the Obligations (each of which may be defended, compromised, settled or pursued by the Bank with counsel of the Bank's election, but at the expense of the Borrower), except for any claim arising out of the gross negligence or willful misconduct of the Bank. The within indemnification shall survive payment of the Obligations, and/or any termination, release or discharge executed by the Bank in favor of the Borrower.

7.5 Costs and Expenses. The Borrower shall pay to the Bank on demand any and all costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements, court costs, litigation and other expenses) incurred or paid by the Bank in establishing, maintaining, protecting or enforcing any of the Bank's rights or the Obligations, including, without limitation, any and all such costs and expenses incurred or paid by the Bank in defending the Bank's security interest in, title or right to the Collateral or in collecting or attempting to collect or enforcing or attempting to enforce payment of the Obligations.

7.6 Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be an original, but all of which shall constitute but one agreement.

7.7 Severability. If any provision of this Agreement or portion of such provision or the application thereof to any person or circumstance shall to any extent be held invalid or unenforceable, the remainder of this Agreement (or the remainder of such provision) and the application thereof to other persons or circumstances shall not be affected thereby.

7.8 Complete Agreement. This Agreement and the other Loan Documents constitute the entire agreement and understanding between and among the parties hereto relating to the subject matter hereof, and supersedes all prior proposals, negotiations, agreements and understandings among the parties hereto with respect to such subject matter.

7.9 Binding Effect of Agreement. This Agreement shall be binding upon and inure to the benefit of the respective heirs, executors, administrators, legal representatives, successors and assigns of the parties hereto, and shall remain in full force and effect (and the Bank shall be entitled to rely thereon) until released in writing by the Bank. The Bank may transfer and assign this Agreement and deliver the Collateral to the assignee, who shall thereupon have all of the rights of the Bank; and the Bank shall then be relieved and discharged of any responsibility or liability with respect to this Agreement and the Collateral. The Borrower may not assign or transfer any of its rights or obligations under this Agreement. Except as expressly provided herein or in the other Loan Documents, nothing, expressed or implied, is intended to confer upon any party, other than the parties hereto, any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.

7.10 Further Assurances. Borrower will from time to time execute and deliver to Bank such documents, and take or cause to be taken, all such other or further action, as Bank may request in order to effect and confirm or vest more securely in Bank all rights contemplated by this Agreement and the other Loan Documents (including, without limitation, to correct clerical errors) or to vest more fully in or assure to the Bank the security interest in the Collateral granted to the Bank by this Agreement or to comply with applicable statute or law and to facilitate the collection of the Collateral (including, without limitation, the execution of stock transfer orders and stock powers, endorsement of promissory notes and instruments and notifications to obligors on the Collateral). To the extent permitted by applicable law,

Borrower authorizes the Bank to file financing statements, continuation statements or amendments, and any such financing statements, continuation statements or amendments may be filed at any time in any jurisdiction. Bank may at any time and from time to time file financing statements, continuation statements and amendments thereto which contain any information required by the Code for the sufficiency or filing office acceptance of any financing statement, continuation statement or amendment, including whether Borrower is an organization, the type of organization and any organization identification number issued to Borrower. Borrower agrees to furnish any such information to Bank promptly upon request. In addition, Borrower shall at any time and from time to time take such steps as Bank may reasonably request for Bank (i) to obtain an acknowledgment, in form and substance satisfactory to Bank, of any bailee having possession of any of the Collateral that the bailee holds such Collateral for Bank, (ii) to obtain "control" (as defined in the Code) of any Collateral comprised of deposit accounts, electronic chattel paper, letter of credit rights or investment property, with any agreements establishing control to be in form and substance satisfactory to Bank, and (iii) otherwise to insure the continued perfection and priority of Bank's security interest in any of the Collateral and the preservation of its rights therein. Borrower hereby constitutes Bank its attorney-in-fact to execute, if necessary, and file all filings required or so requested for the foregoing purposes, all acts of such attorney being hereby ratified and confirmed; and such power, being coupled with an interest, shall be irrevocable until this Agreement terminates in accordance with its terms, all Obligations are irrevocably paid in full and the Collateral is released.

7.11 Amendments and Waivers. This Agreement may be amended and Borrower may take any action herein prohibited, or omit to perform any act herein required to be performed by it, if Borrower shall obtain the Bank's prior written consent to each such amendment, action or omission to act. No course of dealing and no delay or omission on the part of Bank in exercising any right hereunder shall operate as a waiver of such right or any other right and waiver on any one or more occasions shall not be construed as a bar to or waiver of any right or remedy of Bank on any future occasion.

7.12 Terms of Agreement. This Agreement shall continue in full force and effect so long as any Obligations or obligation of Borrower to Bank shall be outstanding, or the Bank shall have any obligation to extend any financial accommodation hereunder, and is supplementary to each and every other agreement between Borrower and Bank and shall not be so construed as to limit or otherwise derogate from any of the rights or remedies of Bank or any of the liabilities, obligations or undertakings of Borrower under any such agreement, nor shall any contemporaneous or subsequent agreement between Borrower and the Bank be construed to limit or otherwise derogate from any of the rights or remedies of Bank or any of the liabilities, obligations or undertakings of Borrower hereunder, unless such other agreement specifically refers to this Agreement and expressly so provides.

7.13 Notices. Any notice under or pursuant to this Agreement shall be a signed writing or other authenticated record (within the meaning of Article 9 of the Code). Any notices under or pursuant to this Agreement shall be deemed duly received and effective if delivered in hand to any officer or agent of the Borrower or Bank, or if mailed by registered or certified mail, return receipt requested, addressed to the Borrower or Bank at the address set forth in this Agreement or as any party may from time to time designate by written notice to the other party.

7.14 Governing Law. This Agreement shall be governed by the laws of the Commonwealth of Massachusetts.

7.15 Reproductions. This Agreement and all documents which have been or may be hereinafter furnished by Borrower to the Bank may be reproduced by the Bank by any photographic, photostatic, microfilm, xerographic or similar process, and any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made in the regular course of business).

7.16 Jurisdiction and Venue. Borrower irrevocably submits to the nonexclusive jurisdiction of any Federal or state court sitting in Massachusetts, over any suit, action or proceeding arising out of or relating to this Agreement. Borrower irrevocably waives, to the fullest extent it may effectively do so

under applicable law, any objection it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that the same has been brought in an inconvenient forum. Borrower hereby consents to any and all process which may be served in any such suit, action or proceeding, (i) by mailing a copy thereof by registered and certified mail, postage prepaid, return receipt requested, to the Borrower's address shown in this Agreement or as notified to the Bank and (ii) by serving the same upon the Borrower in any other manner otherwise permitted by law, and agrees that such service shall in every respect be deemed effective service upon Borrower.

7.17 <u>JURY WAIVER</u>. **THE BORROWER AND BANK EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, AND AFTER AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL, (A) WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING IN CONNECTION WITH THIS AGREEMENT, THE OBLIGATIONS, ALL MATTERS CONTEMPLATED HEREBY AND DOCUMENTS EXECUTED IN CONNECTION HEREWITH AND (B) AGREE NOT TO SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE, OR HAS NOT BEEN, WAIVED. THE BORROWER CERTIFIES THAT NEITHER THE BANK NOR ANY OF ITS REPRESENTATIVES, AGENTS OR COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE BANK WOULD NOT IN THE EVENT OF ANY SUCH PROCEEDING SEEK TO ENFORCE THIS WAIVER OF RIGHT TO TRIAL BY JURY.**

Executed as an instrument under seal as of **July 6, 2018**.

Witness:

______________________

Borrower:
Bancroft Holding LLC

By: ______________________
Scott Duncan, Manager

Accepted: Avidia Bank

By: ______________________
Name: Joseph G. Sova
Title: Senior Vice President

SCHEDULE 3.4

Security interest granted to F&M Sales LLC by Security Agreement and UCC Financing Statement of even date in the original amount of $500,000.

# REVOLVING DEMAND NOTE

July 26, 2018

$350,000.00 Hudson, Massachusetts

For value received, the undersigned [illegible] Holding LLC, a Massachusetts limited liability company, with an address of 39 Pequossette St, Watertown, Massachusetts 02472 (the "Borrower"), promises to pay to the order of Avidia Bank, a savings bank with an address of 42 Main Street, Hudson, Massachusetts 01749 (together with its successors and assigns, the "Bank"), ON DEMAND, the principal amount of Three Hundred Fifty Thousand Dollars and Zero Cents ($350,000.00) or, if less, such amount as may be the aggregate unpaid principal amount of all loans or advances made by the Bank to the Borrower pursuant hereto, together with interest from the date hereof on the unpaid principal balance from time to time outstanding until paid in full. The aggregate principal balance outstanding shall bear interest thereon at a per annum rate equal to One and Three Quarters Percent (1.75%) above the Wall Street Journal Prime Rate (as hereinafter defined). All accrued and unpaid interest shall be payable monthly in arrears on the 5th day of each month, commencing on September 5, 2018.

Wall Street Journal Prime Rate means the highest rate published from time to time by the Wall Street Journal as the Prime Rate, or, in the event the Wall Street Journal ceases publication of the Prime Rate, the base, reference or other rate then designated by the Bank, in its sole discretion, for general commercial loan reference purposes, it being understood that such rate is a reference rate, not necessarily the lowest, established from time to time, which serves as the basis upon which effective interest rates are calculated for loans making reference thereto.

This note allows loan advances (the "revolving line of credit phase") with interest payable monthly on the 5th day of each month, at a variable rate of "Wall Street Journal Prime Rate" plus a margin of 175 basis points, per annum, resulting in an initial rate of 6.75%, adjusting monthly on the 1st day of each calendar month at Prime + 1.75% until the 60th month from the date of the note, (the conversion date"), at which time the "revolving line of credit phase" will no longer be available to advance upon and the loan shall convert to an amortizing loan with principal and interest payment to be determined by the Lender on the outstanding principal balance in effect on the conversion date.

After the conversion date, the Note shall bear interest at a variable rate of "Wall Street Journal Prime Rate" plus a margin of 175 basis points, per annum, adjusting monthly on the 1st day of each calendar month until paid and shall be payable in 60 payment of principal and interest as determined by Bank each beginning 61 months from the date of the note, with the entire unpaid balance of principal and interest being payable 120 months from the date of the Note.

The Lender's agreement to advance funds with respect to the Note shall be subject to an annual review; and there shall be no further advances respecting the Note unless the Lender, in its sole discretion, determines that it shall continue to make advances after any such annual review.

Principal and interest shall be payable at the Bank's main office or at such other place as the Bank may designate in writing in immediately available funds in lawful money of the United States of America without set-off, deduction or counterclaim. Interest shall be calculated on the basis of actual number of days elapsed and a 360-day year.

This Note is a revolving note and, subject to the foregoing and in accordance with the provisions hereof and of any and all other agreements between the Borrower and the Bank related hereto, the Borrower may, at its option, borrow, pay, prepay and reborrow hereunder at any time prior to demand for payment hereunder or such earlier date as the obligations of the Borrower to the Bank under this Note, and any other agreements between the Bank and the Borrower related hereto, shall become due and payable, or the obligation of the Bank to extend financial accommodations to the Borrower shall terminate; provided, however, that in any event the principal balance outstanding hereunder shall at no time exceed the face amount of this Note. This Note shall continue in full force and effect until all obligations and liabilities evidenced by this Note are paid in full and the Bank is no longer obligated to extend financial accommodations to the Borrower, even if, from time to time, there are no amounts outstanding respecting this Note. Notwithstanding that this Note shall be due and payable ON DEMAND, the Bank's agreement to advance funds respecting this Note shall be subject to annual review; and there shall be no further advances respecting this Note unless the Bank, in its sole discretion, determines that it shall continue to make advances after any such annual review; provided, that notwithstanding such annual review as provided in this paragraph, this Note shall be due and payable ON DEMAND.

Any payments received by the Bank on account of this Note shall, at the Bank's option, be applied first, to accrued and unpaid interest; second, to the unpaid principal balance hereof; third to any costs, expenses or charges then owed to the Bank by the Borrower; and the balance to escrows, if any. Notwithstanding the foregoing, any payments received after demand for payment shall be applied in such manner as the Bank may determine. The Borrower hereby authorizes the Bank to charge any deposit account which the Borrower may maintain with the Bank for any payment required hereunder without prior notice to the Borrower.

If pursuant to the terms of this Note, the Borrower is at any time obligated to pay interest on the principal balance at a rate in excess of the maximum interest rate permitted by applicable law for the loan evidenced by this Note, the applicable interest rate shall be immediately reduced to such maximum rate and all previous payments in excess of the maximum rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.

The Borrower represents to the Bank that the proceeds of this Note will not be used for personal, family or household purposes or for the purpose of purchasing or carrying margin stock or margin securities within the meaning of Regulations U and X of the Board of Governors of the Federal Reserve System, 12 C.F.R. Parts 221 and 224.

The Borrower and each endorser and guarantor hereof grant to the Bank a continuing lien on and security interest in any and all deposits or other sums at any time credited by or due from the Bank to the Borrower and/or each endorser or guarantor hereof and any cash, securities, instruments or other property of the Borrower and each endorser and guarantor hereof in the possession of the Bank, whether for safekeeping or otherwise, or in transit to or from the Bank (regardless of the reason the Bank had received the same or whether the Bank has conditionally released the same) as security for the full and punctual payment and performance of all of the liabilities and obligations of the Borrower and/or any endorser or guarantor hereof to the Bank and such deposits and other sums may be applied or set off against such liabilities and obligations of the Borrower or any endorser or guarantor hereof to the Bank at any time, whether or not such are then due, whether or not demand has been made and whether or not other collateral is then available to the Bank.

No delay or omission on the part of the Bank in exercising any right hereunder shall operate as a waiver of such right or of any other right of the Bank, nor shall any delay, omission or waiver on any one occasion be deemed a bar to or waiver of the same or any other right on any future occasion. The Borrower and every endorser or guarantor of this Note, regardless of the time, order or place of signing, waive presentment, demand, protest, notice of intent to accelerate, notice of acceleration and all other notices of every kind in connection with the delivery, acceptance, performance or enforcement of this Note and assent to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of collateral, and to the addition or release of any other party or person primarily or secondarily liable and waives all recourse to suretyship and guarantor defenses generally, including any defense based on impairment of collateral. To the maximum extent permitted by law, the Borrower and each endorser and guarantor of this Note waive and terminate any homestead rights and/or exemptions respecting any premises under the provisions of any applicable homestead laws, including without limitation, Chapter 188, Section 1, of the General Laws of Massachusetts.

The Borrower and each endorser and guarantor of this Note shall indemnify, defend and hold the Bank and its directors, officers, employees, agents and attorneys (each an "Indemnitee") harmless against any claim brought or threatened against any Indemnitee by the Borrower, by any endorser or guarantor, or by any other person (as well as from attorneys' reasonable fees and expenses in connection therewith) on account of the Bank's relationship with the Borrower or any endorser or guarantor hereof (each of which may be defended, compromised, settled or pursued by the Bank with counsel of the Bank's selection, but at the expense of the Borrower and any endorser and/or guarantor), except for any claim arising out of the gross negligence or willful misconduct of the Bank.

The Borrower and each endorser and guarantor of this Note agree to pay, upon demand, costs of collection of all amounts under this Note including, without limitation, principal and interest, or in connection with the enforcement of, or realization on, any security for this Note, including, without limitation, to the extent permitted by applicable law, reasonable attorneys' fees and expenses. Upon demand for payment of any amounts hereunder, interest shall accrue at a rate per annum equal to the aggregate of 5.0% plus the rate provided for herein. If any payment due under this Note is unpaid for 10 days or more, the Borrower shall pay, in addition to any other sums due under this Note (and without limiting the Bank's other remedies on account thereof), a late charge equal to the greater of $25.00 or 5.0% of such unpaid amount.

This Note shall be binding upon the Borrower and each endorser and guarantor hereof and upon their respective heirs, successors, assigns and legal representatives, and shall inure to the benefit of the Bank and its successors, endorsees and assigns.

The liabilities of the Borrower and each Borrower, if more than one, and any endorser or guarantor of this Note are joint and several; provided, however, the release by the Bank of the Borrower or any one or more endorsers or guarantors shall not release any other person obligated on account of this Note. Any and all present and future debts of the Borrower to any endorser or guarantor of this Note are subordinated to the full payment and performance of all present and future debts and obligations of the Borrower to the Bank. Each reference in this Note to the Borrower and each Borrower, if more than one, and endorser or guarantor of this Note, is to such person individually and also to all such persons jointly. No person obligated on account of this Note may seek contribution from any other person also obligated, unless and until all liabilities, obligations and indebtedness to the Bank of the person from whom contribution is sought have been irrevocably satisfied in full. The release or compromise by the Bank of any collateral shall not release any person obligated on account of this Note.

The Borrower and each endorser and guarantor hereof each authorizes the Bank to complete this Note if delivered incomplete in any respect. A photographic or other reproduction of this Note may be

made by the Bank, and any such reproduction shall be admissible in evidence with the same effect as the original itself in any judicial or administrative proceeding, whether or not the original is in existence.

The Borrower will from time to time execute and deliver to the Bank such documents, and take or cause to be taken, all such other further action, as the Bank may request in order to effect and confirm or vest more securely in the Bank all rights contemplated by this Note or any other loan documents related thereto (including, without limitation, to correct clerical errors) or to vest more fully in or assure to the Bank the security interest in any collateral securing this Note or to comply with applicable statute or law.

This Note shall be governed by the laws of the Commonwealth of Massachusetts.

Any notices under or pursuant to this Note shall be deemed duly received and effective if delivered in hand to any officer or agent of the Borrower or Bank, or if mailed by registered or certified mail, return receipt requested, addressed to the Borrower or Bank at the address set forth in this Note or as any party may from time to time designate by written notice to the other party.

The Borrower and each endorser and guarantor of this Note each irrevocably submits to the nonexclusive jurisdiction of any Federal or state court sitting in Massachusetts, over any suit, action or proceeding arising out of or relating to this Note. Each of the Borrower and each endorser and guarantor irrevocably waives, to the fullest extent it may effectively do so under applicable law, any objection it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that the same has been brought in an inconvenient forum. Each of the Borrower and each endorser and guarantor hereby consents to any and all process which may be served in any such suit, action or proceeding, (i) by mailing a copy thereof by registered and certified mail, postage prepaid, return receipt requested, to the Borrower's, endorser's or guarantor's address shown below or as notified to the Bank and (ii) by serving the same upon the Borrower(s), endorser(s) or guarantor(s) in any other manner otherwise permitted by law, and agrees that such service shall in every respect be deemed effective service upon the Borrower or such endorser or guarantor.

THE BORROWER AND EACH ENDORSER AND GUARANTOR ACKNOWLEDGE THAT THIS NOTE IS A DEMAND NOTE AND THE RIGHT OF THE BANK TO DEMAND PAYMENT OF THIS NOTE IN WHOLE OR IN PART AT ANY TIME SHALL BE ABSOLUTE, UNCONDITIONAL AND IN THE SOLE DISCRETION OF THE BANK. THE INCLUSION OF EVENTS OF DEFAULT AND COVENANTS IN ANY LOAN DOCUMENTS BETWEEN THE BANK AND THE BORROWER OR ANY ENDORSER OR GUARANTOR OR ANY OTHER PARTY DELIVERED IN CONNECTION WITH THIS NOTE OR OTHERWISE SHALL NOT IN ANY WAY LIMIT THE DEMAND NATURE OF THIS NOTE AND THE BANK MAY MAKE DEMAND FOR PAYMENT AT ANY TIME FOR ANY OR NO REASON, WHETHER OR NOT AN EVENT OF DEFAULT HAS OCCURRED UNDER ANY SUCH LOAN DOCUMENTS.

THE BORROWER, EACH ENDORSER AND GUARANTOR AND THE BANK EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, AND AFTER AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL, (A) WAIVES ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING IN CONNECTION WITH THIS NOTE, ANY OF THE OBLIGATIONS OF THE BORROWER, EACH ENDORSER AND GUARANTOR TO THE BANK, AND ALL MATTERS CONTEMPLATED HEREBY AND DOCUMENTS EXECUTED IN CONNECTION HEREWITH AND (B) AGREES NOT TO SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CAN NOT BE, OR HAS NOT BEEN, WAIVED. THE BORROWER, EACH ENDORSER AND GUARANTOR AND THE BANK EACH CERTIFIES THAT NEITHER THE BANK NOR ANY OF ITS REPRESENTATIVES, AGENTS OR COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE BANK WOULD NOT IN THE EVENT OF ANY SUCH PROCEEDING SEEK TO ENFORCE THIS WAIVER OF RIGHT TO TRIAL BY JURY.

Executed as an instrument under seal as of July 26, 2018.

Witness: Borrower:

Bancroft Holding LLC

__________________ By: __________________
Scott Duncan, Manager

39 Pequossette St
Watertown, Massachusetts
02472

DocuSign Envelope ID: 11EC3F13-95DC-4F42-8OBE-ED706DEE8FDE

# ALLONGE TO REVOLVING SBA DEMAND NOTE (78020001487)

This Allonge is for the purpose of amending the terms and conditions, as contained in a certain Revolving SBA Demand Note in the original principal amount of $350,000.00 dated July 26, 2018 from Bancroft Holding LLC to Avidia Bank, having a principal office at 42 Main Street, Hudson, Massachusetts. The Note is hereby amended to modify the terms as follows:

1. Commencing March 23, 2020 payments of interest will be deferred for the months of April, May and June 2020.

2. Monthly payments of interest shall commence on July 5, 2020.

Nothing in the Allonge shall in any way impair the Note or security granted therefor, or alter, or in any way, vary or affect any provision therein, it being the intent that the Loan Documents and Note shall continue in full force and effect, except as modified herein.

*This [Allonge to 78020001487] is being created and will be stored electronically. When you sign this [Allonge to 78020001487] electronically, you are agreeing that this document is a "transferable record" for purposes of the laws governing electronic transactions. The Bank has the right to control the transferable record. Your electronic signature on this [Allonge to 78020001487] will have the same effect as if you had signed it on paper.*

Signed as an instrument under seal this 23rd, day of March 2020.

Bancroft Holding LLC

DocuSigned by:

By: Scott Duncan

Scott Duncan, Manager

Exhibit D

78020001487

LOAN AND SECURITY AGREEMENT

This LOAN AND SECURITY AGREEMENT (this "Agreement") is entered into at Hudson, Massachusetts, as of July 26, 2018, between Bancroft Holding LLC, a Massachusetts limited liability company, with its chief executive office located at 39 Pequossette St. Watertown, Massachusetts 02472 (the "Borrower") and Avidia Bank, a savings bank, with an address of 42 Main Street, Hudson, Massachusetts 01749 (the "Bank").

FOR VALUE RECEIVED, and in consideration of the granting by the Bank of financial accommodations to or for the benefit of the Borrower, including without limitation respecting the Obligations (as hereinafter defined), the Borrower represents to and agrees with the Bank, as of the date hereof and as of the date of each loan, credit and/or other financial accommodation, as follows:

## 1. THE LOAN

1.1 Revolving Loans. Bank agrees, in its sole discretion, to make revolving loans (the "Revolving Loans") to or for the account of Borrower, upon Borrower's request therefor, in an aggregate amount of up to Three Hundred Fifty Thousand Dollars and Zero Cents ($350,000.00) (the "Revolving Loan Amount") or such other amounts as may from time to time be established by Bank, subject to the terms and conditions set forth herein. Loan advances respecting Revolving Loans are unconditionally cancellable at any time at the Bank's discretion. The Revolving Loans shall be evidenced by that certain Revolving Demand Note, of even date herewith (the "Revolving Note"), by Bancroft Holding LLC in favor of the Bank in the face amount of the Revolving Loan Amount. This Agreement, the Revolving Note, and any and all other documents, amendments or renewals executed and delivered in connection with any of the foregoing are collectively hereinafter referred to as the "Loan Documents".

1.2 Revolving Loan Account. An account shall be opened on the books of Bank in which account a record will be kept of all Revolving Loans, and all payments thereon and other appropriate debits and credits as provided by this Agreement.

1.3 Interest. Interest respecting the Revolving Loans will be charged to Borrower on the principal amount from time to time outstanding at the interest rate specified in the Revolving Note in accordance with the terms of the Revolving Note.

1.4 Demand and Annual Review. All loans and advances made respecting the Revolving Loans shall be payable to Bank on DEMAND, notwithstanding the inclusion of events of default in this Agreement or in any other Loan Document and whether or not any event of default has occurred under this Agreement or any of the Loan Documents. Notwithstanding that all loans and advances made by Bank to Borrower under or pursuant to this Agreement respecting the Revolving Loans shall be due and payable ON DEMAND, the Bank's agreement to advance funds respecting the Revolving Loans shall be subject to annual review, and there shall be no further advances respecting the Revolving Loans unless the Bank, in its sole discretion, determines that it shall continue to make advances after any such annual review, provided, that notwithstanding such annual review as provided in this paragraph, all loans and advances made shall be due and payable ON DEMAND.

1.5 Overadvances. Any Revolving Loans that may be made, at the Bank's sole discretion, in excess of the Revolving Loan Amount shall not limit the obligations of Borrower or any of the Bank's rights or remedies hereunder or under the Loan Documents or otherwise; all such Revolving Loans shall be secured by the Collateral, as hereinafter defined, and shall be due and payable to the Bank in accordance with the terms of the Revolving Note, and shall bear interest at the rate set forth in the Revolving Note. All checks or other items paid by Bank which cause an overdraft in any deposit account maintained by Borrower with Bank shall, at the option of the Bank, constitute an advance to Borrower pursuant to this Agreement respecting the Revolving Loans, repayable on demand, and shall be secured by all Collateral.

1.0 Authorized Persons; Advances. Any person duly authorized in writing by the Borrower, or in the absence of such a writing, the manager or managing member of the Borrower, or any person otherwise authorized in this paragraph, may request discretionary loans hereunder, either orally or otherwise, but the Bank at its option may require that all requests for loans hereunder shall be in writing. The Bank shall incur no liability to Borrower in acting upon any request referred to herein which the Bank believes in good faith to have been made by an authorized person or persons. Each loan hereunder may be credited by Bank to any deposit account of Borrower with Bank or with any other Bank with which Borrower maintains a deposit account, or may be paid to Borrower (or as Borrower instructs) or may be applied to any Obligations, as Bank may in each instance elect.

1.7 Monthly Statement. At the option of the Bank, after the end of each month, Bank will render to Borrower a statement of the Revolving Loan account, showing all applicable credits and debits. Each statement shall be considered correct and to have been accepted by Borrower and shall be conclusively

binding upon Borrower in respect of all charges, debits and credits of whatsoever nature contained therein respecting the Revolving Loans, and the closing balance shown therein, unless Borrower notifies Bank in writing of any discrepancy within Twenty (20) days from the mailing by Bank to Borrower of any such monthly statement.

## 2. GRANT OF SECURITY INTEREST

2.1 Grant of Security Interest. In consideration of the Bank's extending credit and other financial accommodations to or for the benefit of the Borrower, the Borrower hereby grants to the Bank a security interest in, a lien on and pledge and assignment of the Collateral (as hereinafter defined). The security interest granted by this Agreement is given to and shall be held by the Bank as security for the payment and performance of all Obligations, including, without limitation, all amounts outstanding pursuant to the Loan Documents.

2.2 Definitions. The following definitions shall apply:

(a) "Code" shall mean the Massachusetts Uniform Commercial Code, General Laws, Chapter 106 as amended from time to time.

(b) "Collateral" shall mean all of the Borrower's present and future right, title and interest in and to any and all of the personal property of the Borrower whether such property is now existing or hereafter created, acquired or arising and wherever located from time to time, including without limitation:

(i) accounts;

(ii) chattel paper;

(iii) goods;

(iv) inventory;

(v) equipment;

(vi) fixtures

(vii) farm products;

(viii) instruments;

(ix) investment property;

(x) documents;

(xi) commercial tort claims;

(xii) deposit accounts;

(xiii) letter-of-credit rights;

(xiv) general intangibles;

(xv) supporting obligations; and

(xvi) records of, accession to and proceeds and products of the foregoing

(c) "Debtors" shall mean the Borrower's customers who are indebted to the Borrower.

(d) "Obligation(s)" shall mean, without limitation, all loans, advances, indebtedness, notes, liabilities and amounts, liquidated or unliquidated, owing by the Borrower to the Bank at any time, of each and every kind, nature and description, whether arising under this Agreement or otherwise, and whether secured or unsecured, direct or indirect (that is, whether the same are due directly by the Borrower to the Bank; or are due indirectly by the Borrower to the Bank as endorser, guarantor or other surety, or as borrower of obligations due third persons which have been endorsed or assigned to the Bank, or otherwise), absolute or contingent, due or to become due, now existing or hereafter arising or contracted, including, without limitation, payment when due of all amounts outstanding respecting any of the Loan Documents. Said term shall also include all interest and other charges chargeable to the Borrower or due from the Borrower to the Bank from time to time and all costs and expenses referred to in this Agreement.

(e) "Person" or "party" shall mean individuals, partnerships, corporations, limited liability companies and all other entities.

All words and terms used in this Agreement other than those specifically defined herein shall have the meanings accorded to them in the Code.

2.3. Ordinary Course of Business. The Bank hereby authorizes and permits the Borrower to hold, process, sell, use or consume in the manufacture or processing of finished goods, or otherwise dispose of inventory for fair consideration, all in the ordinary course of the Borrower's business, excluding, without limitation, sales to creditors or in bulk or sales or other dispositions occurring under circumstances which would or could create any lien or interest adverse to the Bank's security interest or other right hereunder in the proceeds resulting therefrom. The Bank also hereby authorizes and permits the Borrower to receive from the Debtors all amounts due as proceeds of the Collateral at the Borrower's own cost and expense, and also liability, if any, subject to the direction and control of the Bank at all times; and the Bank may at any time, without cause or notice, and whether or not an Event of Default has occurred or demand has been made, terminate all or any part of the authority and permission herein or elsewhere in this Agreement granted to the Borrower with reference to the Collateral, and notify Debtors to make all payments due as proceeds of the Collateral to the Bank. Until Bank shall otherwise notify Borrower, all proceeds of and collections of Collateral shall be retained by Borrower and used solely for the ordinary and usual operation of Borrower's business. From and after notice by Bank to Borrower, all proceeds of and collections of the Collateral shall be held in trust by Borrower for Bank and shall not be commingled with Borrower's other funds or deposited in any Bank account of Borrower; and Borrower agrees to deliver to Bank on the dates of receipt thereof by Borrower, duly endorsed to Bank or to bearer, or assigned to Bank, as may be appropriate, all proceeds of the Collateral in the identical form received by Borrower.

2.4 Allowances. Absent an Event of Default the Borrower may grant such allowances or other adjustments to Debtors (exclusive of extending the time for payment of any item which shall not be done without first obtaining the Bank's written consent in each instance) as the Borrower may reasonably deem to accord with sound business practice, including, without limiting the generality of the foregoing, accepting the return of all or any part of the inventory (subject to the provisions set forth in this Agreement with reference to returned inventory).

2.5 Records. The Borrower shall hold its books and records relating to the Collateral segregated from all the Borrower's other books and records in a manner satisfactory to the Bank; and shall deliver to the Bank from time to time promptly at its request all invoices, original documents of title, contracts, chattel paper, instruments and any other writings relating thereto, and other evidence of performance of contracts, or evidence of shipment or delivery of the merchandise or of the rendering of services; and the Borrower will deliver to the Bank promptly at the Bank's request from time to time additional copies of any or all of such papers or writings, and such other information with respect to any of the Collateral and such schedules of inventory, schedules of accounts and such other writings as the Bank may, in its sole discretion deem to be necessary or effectual to evidence any loan hereunder or the Bank's security interest in the Collateral.

2.6 Legends. The Borrower shall promptly make, stamp or record such entries or legends on the Borrower's books and records or on any of the Collateral (including, without limitation, chattel paper) as Bank shall request from time to time, to indicate and disclose that Bank has a security interest in such Collateral.

2.7 Inspection. The Bank, or its representatives, at any time and from time to time, shall have the right at the sole cost and expense of Borrower, and the Borrower will permit the Bank and/or its representatives (a) to examine, check, make copies of or extracts from any of the Borrower's books, records and files (including, without limitation, orders and original correspondence); (b) to perform field exams or otherwise inspect and examine the Collateral and to check, test or appraise the same as to quality, quantity, value and condition; and (c) to verify the Collateral or any portion or portions thereof or the Borrower's compliance with the provisions of this Agreement.

2.8 Purchase Money Security Interests. To the extent the Borrower uses proceeds of any loans to purchase Collateral, the repayment of such loans shall be on a "first-in-first-out" basis so that the portion of the loan used to purchase a particular item of Collateral shall be repaid in the order in which Borrower purchased such item of Collateral.

2.9 Search Reports. Bank shall receive prior to the date of this Agreement UCC search results under all names used by the Borrower during the prior five (5) years, from each jurisdiction where any Collateral is located, from the State, if any, where the Borrower is organized and registered (as such terms are used in the Code), and the State where the Borrower's chief executive office is located. The search results shall confirm that the security interest in the Collateral granted Bank hereunder is prior to all other security interests in favor of any other person.

## 3. REPRESENTATIONS AND WARRANTIES

3.1 Organization and Qualification. Borrower is a duly organized and validly existing limited liability company under the laws of the State of its formation, with the exact legal name set forth in the first paragraph of this Agreement. Borrower is in good standing under the laws of said State, has the power to own its property and conduct its business as now conducted and as currently proposed to be conducted, and is duly qualified to do business under the laws of each state where the nature of the business done or property owned requires such qualification.

3.2 Related Parties. Borrower has no interest in any entities other than those listed on Schedule 3.2, if any, and the Borrower has never consolidated, merged or acquired substantially all of the assets of any other entity or person other than those listed on Schedule 3.2, if any.

3.3 Limited Liability Company Records. Borrower's certificate of organization, articles of organization or other charter document and all amendments thereto have been duly filed and are in proper order. All members of the Borrower are properly reflected on all books and records of the Borrower, including but not limited to its operating agreement, minute books, bylaws and books of account, all of which are accurate and up to date and will be so maintained.

3.4 Title to Properties; Absence of Liens. Borrower has good and clear record and marketable title to all of its properties and assets, and all of its properties and assets including the Collateral are free and clear of all mortgages, liens, pledges, charges, encumbrances and setoffs, other than the security interest therein granted to the Bank and (a) the mortgages, deeds of trust and security interests as set forth on Schedule 3.4, if any, and (b) the leases of personal property as set forth on Schedule 3.4, if any.

3.5 Places of Business. Borrower's chief executive office is correctly stated in the preamble to this Agreement, and Borrower shall, during the term of this Agreement, keep the Bank currently and accurately informed in writing of each of its other places of business, and shall not change the location of such chief executive office or open or close, move or change any existing or new place of business without giving the Bank at least thirty (30) days prior written notice thereof.

3.6 Valid Obligations. The execution, delivery and performance of the Loan Documents have been duly authorized by all necessary action and each represents a legal, valid and binding obligation of Borrower and is fully enforceable according to its terms, except as limited by equity or laws relating to the enforcement of creditors' rights.

3.7 Conflicts. There is no provision in Borrower's organizational or charter documents, if any, or in any indenture, contract or agreement to which Borrower is a party which prohibits, limits or restricts the execution, delivery or performance of the Loan Documents.

3.8 Governmental Approvals. The execution, delivery and performance of the Loan Documents does not require any approval of or filing with any governmental agency or authority.

3.9. Litigation, etc. There are no actions, claims or proceedings pending or to the knowledge of Borrower threatened against Borrower which might materially adversely affect the ability of Borrower to conduct its business or to pay or perform the Obligations.

3.10 Financial Statements. The Borrower has furnished to the Bank the following Financial Statements (the "Financial Statements"): balance sheet as of December 31, 2017, and statement of profit and loss for the period ending December 31, 2017. The balance sheet fairly presents the condition of the Borrower at the date thereof and the statement of profit and loss fairly presents the results of the operations of the Borrower for the period indicated, all in conformity with generally accepted accounting principles, consistently applied.

3.11 Accounts and Contract Rights. All accounts arise out of legally enforceable and existing contracts, and represent unconditional and undisputed bona fide indebtedness by a Debtor, and are not and will not be subject to any discount (except such cash or trade discount as may be shown on any invoice, contract or other writing delivered to the Bank). No contract right, account, general intangible or chattel paper is or will be represented by any note or other instrument, and no contract right, account or general intangible is, or will be represented by any conditional or installment sales obligation or other chattel paper, except such instruments or chattel paper as have been or immediately upon receipt by the Borrower will be delivered to the Bank (duly endorsed or assigned), such delivery, in the case of chattel paper, to include all executed copies except those in the possession of the installment buyer and any security for or guaranty of any of the Collateral shall be delivered to the Bank immediately upon receipt thereof by the Borrower, with such assignments and endorsements thereof as the Bank may request.

3.12 Title to Collateral. At the date hereof the Borrower is (and as to Collateral that the Borrower may acquire after the date hereof, will be) the lawful owner of the Collateral, and the Collateral and each item thereof is, will be and shall continue to be free of all restrictions, liens, encumbrances or other rights, title or interests (other than the security interest therein granted to the Bank), credits, defenses, recoupments, setoffs or counterclaims whatsoever. The Borrower has and will have full power and authority to grant to the Bank a security interest in the Collateral and the Borrower has not transferred, assigned, sold, pledged, encumbered, subjected to lien or granted any security interest in, and will not transfer, assign, sell (except sales or other dispositions in the ordinary course of business in respect to inventory as expressly permitted in this Agreement), pledge, encumber, subject to lien or grant any security interest in any of the Collateral (or any of the Borrower's right, title or interest therein), to any person other than the Bank. The Collateral is and will be valid and genuine in all respects. The Borrower will warrant and defend the Bank's right to and interest in the Collateral against all claims and demands of all persons whatsoever.

3.13 Location of Collateral. Except for sale, processing, use, consumption or other disposition in the ordinary course of business, the Borrower will keep all inventory and equipment only at locations specified in this Agreement or specified to the Bank in writing. The Borrower shall, during the term of this

Agreement, keep the Bank currently and accurately informed in writing of each location where the Borrower's records relating to its accounts and contract rights, respectively, are kept, and shall not remove such records or any of them to another location without giving the Bank at least thirty (30) days prior written notice thereof.

3.14 Third Parties. The Bank shall not be deemed to have assumed any liability or responsibility to the Borrower or any third person for the correctness, validity or genuineness of any instruments or documents that may be released or endorsed to the Borrower by the Bank (which shall automatically be deemed to be without recourse to the Bank in any event) or for the existence, character, quantity, quality, condition, value or delivery of any goods purporting to be represented by any such documents; and the Bank, by accepting such security interest in the Collateral, or by releasing any Collateral to the Borrower, shall not be deemed to have assumed any obligation or liability to any supplier or Debtor or to any other third party, and the Borrower agrees to indemnify and defend the Bank and hold it harmless in respect to any claim or proceeding arising out of any matter referred to in this paragraph.

3.15 Payment of Accounts. Each account or other item of Collateral, other than inventory and equipment, will be paid in full on or before the date shown as its due date in the schedule of Collateral, in the copy of the invoice(s) relating to the account or other Collateral or in contracts relating thereto. Upon any suspension of business, assignment or trust mortgage for the benefit of creditors, dissolution, petition in receivership or under any chapter of the Bankruptcy Code as amended from time to time by or against any Debtor, any Debtor becoming insolvent or unable to pay its debts as they mature or any other act of the same or different nature amounting to a business failure, the Borrower will immediately notify the Bank thereof.

3.16 Changes. Since the date of the Financial Statements, there have been no changes in the assets, liabilities, financial condition or business of the Borrower, other than changes in the ordinary course of business, the effect of which have, in the aggregate, been materially adverse.

3.17 Taxes. The Borrower has filed all Federal, state and other tax returns required to be filed (except for such returns for which current and valid extensions have been filed), and all taxes, assessments and other governmental charges due from the Borrower have been fully paid. The Borrower has established on its books reserves adequate for the payment of all Federal, state and other tax liabilities (if any).

3.18 Use of Proceeds. No portion of any loan is to be used for (i) the purpose of purchasing or carrying any "margin security" or "margin stock" as such terms are used in Regulations U and X of the Board of Governors of the Federal Reserve System, 12 C.F.R. 221 and 224 or (ii) primarily personal, family or household purposes. The Collateral is not used or acquired primarily for personal, family or household purposes.

3.19 Environmental. As of the date hereof neither the Borrower nor any of Borrower's agents, employees or independent contractors (1) have caused or are aware of a release or threat of release of Hazardous Materials (as defined herein) on any of the premises or personal property owned or controlled by Borrower ("Controlled Property") or any property abutting Controlled Property ("Abutting Property"), which could give rise to liability under any Environmental Law (as defined herein) or any other Federal, state or local law, rule or regulation; (2) have arranged for the transport of or transported any Hazardous Materials in a manner as to violate, or result in potential liabilities under, any Environmental Law; (3) have received any notice, order or demand from the Environmental Protection Agency or any other Federal, state or local agency under any Environmental Law; (4) have incurred any liability under any Environmental Law in connection with the mismanagement, improper disposal or release of Hazardous Materials; or (5) are aware of any inspection or investigation of any Controlled Property or Abutting Property by any Federal, state or local agency for possible violations of any Environmental Law.

To the best of Borrower's knowledge, neither Borrower, nor any prior owner or tenant of any Controlled Property, committed or omitted any act which caused the release of Hazardous Materials on such Controlled Property which could give rise to a lien thereon by any Federal, state or local government. No notice or statement of claim or lien affecting any Controlled Property has been recorded or filed in any public records by any Federal, state or local government for costs, penalties, fines or other charges as to such property. All notices, permits, licenses or similar authorizations, if any, required to be obtained or filed in connection with the ownership, operation, or use of the Controlled Property, including without limitation, the past or present generation, treatment, storage, disposal or release of any Hazardous Materials into the environment, have been duly obtained or filed.

Borrower agrees to indemnify and hold the Bank harmless from all liability, loss, cost, damage and expense, including attorney fees and costs of litigation, arising from any and all of its violations of any Environmental Law (including those arising from any lien by any Federal, state or local government arising from the presence of Hazardous Materials) or from the presence of Hazardous Materials located on or emanating from any Controlled Property or Abutting Property whether existing or not existing and whether known or unknown at the time of the execution hereof and regardless of whether or not caused by, or within the control of Borrower. Borrower further agrees to reimburse Bank upon demand for any costs incurred by Bank in connection with the foregoing. Borrower agrees that its obligations hereunder shall be continuous and shall survive the repayment of all debts to Bank and shall continue so long as a valid claim may be lawfully asserted against the Bank.

The term "Hazardous Materials" includes but is not limited to any and all substances (whether solid,

liquid or gas) defined, listed, or otherwise classified as pollutants, hazardous wastes, hazardous substances, hazardous materials, extremely hazardous wastes, or words of similar meaning or regulatory effect under any present or future Environmental Law or that may have a negative impact on human health or the environment, including but not limited to petroleum and petroleum products, asbestos and asbestos-containing materials, polychlorinated biphenyls, lead, radon, radioactive materials, flammables and explosives.

The term "Environmental Law" means any present and future Federal, state and local laws, statutes, ordinances, rules, regulations and the like, as well as common law, relating to protection of human health or the environment, relating to Hazardous Materials, relating to liability for or costs of remediation or prevention of releases of Hazardous Materials or relating to liability for or costs of other actual or threatened danger to human health or the environment. The term "Environmental Law" includes, but is not limited to, the following statutes, as amended, any successor thereto, and any regulations promulgated pursuant thereto, and any state or local statutes, ordinances, rules, regulations and the like addressing similar issues: the Comprehensive Environmental Response, Compensation and Liability Act; the Emergency Planning and Community Right-to-Know Act; the Hazardous Materials Transportation Act; the Resource Conservation and Recovery Act (including but not limited to Subtitle I relating to underground storage tanks); the Solid Waste Disposal Act; the Clean Water Act; the Clean Air Act; the Toxic Substances Control Act; the Safe Drinking Water Act; the Occupational Safety and Health Act; the Federal Water Pollution Control Act; the Federal Insecticide, Fungicide and Rodenticide Act; the Endangered Species Act; the National Environmental Policy Act; the River and Harbors Appropriation Act and the Massachusetts Hazardous Waste Management Act, M.G.L. Chapter 21C, and the Massachusetts Oil and Hazardous Material Release Prevention and Response Act, M.G.L. Chapter 21E.

## 4. AFFIRMATIVE COVENANTS

4.1 Payments and Performance. Borrower will duly and punctually pay all Obligations becoming due to the Bank and will duly and punctually perform all Obligations on its part to be done or performed under this Agreement.

4.2 Books and Records; Inspection. Borrower will at all times keep proper books of account in which full, true and correct entries will be made of its transactions in accordance with generally accepted accounting principles, consistently applied and which are, in the opinion of a Certified Public Accountant acceptable to Bank, adequate to determine fairly the financial condition and the results of operations of Borrower. Borrower will at all reasonable times make its books and records available in its offices for inspection, examination and duplication by the Bank and the Bank's representatives and will permit inspection of the Collateral and all of its properties by the Bank and the Bank's representatives. Borrower will from time to time furnish the Bank with such information and statements as the Bank may request in its sole discretion with respect to the Obligations or the Bank's security interest in the Collateral. Borrower shall, during the term of this Agreement, keep the Bank currently and accurately informed in writing of each location where Borrower's records relating to its accounts and contract rights are kept, and shall not remove such records to another location without giving the Bank at least thirty (30) days prior written notice thereof.

4.3 Financial Statements. Borrower will furnish to Bank:

(a) within 15 days after the close of each quarterly fiscal period of Borrower, an Accounts Receivable aging report in form satisfactory to Bank showing the total amount due from each account debtor, the month in which each Account Receivable was created, as well as an accounts payable aging report and such other information as Bank shall request;

(b) Within 15 days of quarter end, a balance sheet and profit & loss statement will be provided to the Bank.

(c) Borrower's filed Federal tax returns, including all schedules thereto, for the prior year within 120 days after the date that Borrower's tax returns are required to be filed each such year or by such other date approved by the Bank;

(d) from time to time, such financial data and information about Borrower as Bank may reasonably request; and

(e) any financial data and information about any guarantors of the Obligations as Bank may reasonably request.

4.4 Conduct of Business. The Borrower will maintain its existence in good standing and comply with all laws and regulations of the United States and of any state or states thereof and of any political subdivision thereof, and of any governmental authority which may be applicable to it or to its business; provided that this covenant shall not apply to any tax, assessment or charge which is being contested in good faith and with respect to which reserves have been established and are being maintained.

4.5 Notice to Account Debtors. The Borrower agrees, at the request of the Bank, to notify all or any of the Debtors in writing of the Bank's security interest in the Collateral in whatever manner the Bank requests and, hereby authorizes the Bank to notify all or any of the Debtors of the Bank's security interest in the Borrower's accounts at the Borrower's expense.

4.6 Contact with Accountant. The Borrower hereby authorizes the Bank to directly contact and communicate with any accountant employed by Borrower in connection with the review and/or maintenance of Borrower's books and records or preparation of any financial reports delivered by or at the request of Borrower to Bank.

4.7 Operating and Deposit Accounts. The Borrower shall maintain with the Bank its primary operating and deposit accounts. At the option of the Bank, all loan payments and fees will automatically be debited from the Borrower's primary operating account and all advances will automatically be credited to the Borrower's primary operating account.

4.8 Taxes. Borrower will promptly pay all real and personal property taxes, assessments and charges and all franchise, income, unemployment, retirement benefits, withholding, sales and other taxes assessed against it or payable by it before delinquent; provided that this covenant shall not apply to any tax assessment or charge which is being contested in good faith and with respect to which reserves have been established and are being maintained. The Bank may, at its option, from time to time, discharge any taxes, liens or encumbrances of any of the Collateral, and the Borrower will pay to the Bank on demand or the Bank in its sole discretion may charge to the Borrower all amounts so paid or incurred by it.

4.9 Maintenance. Borrower will keep and maintain the Collateral and its other properties, if any, in good repair, working order and condition. Borrower will immediately notify the Bank of any loss or damage to or any occurrence which would adversely affect the value of any Collateral. The Bank may, at its option, from time to time, take any other action that the Bank may deem proper to repair, maintain or preserve any of the Collateral, and the Borrower will pay to the Bank on demand or the Bank in its sole discretion may charge to the Borrower all amounts so paid or incurred by it.

4.10 Insurance. Borrower will maintain in force property and casualty insurance on all Collateral and any other property of the Borrower, if any, against risks customarily insured against by companies engaged in businesses similar to that of the Borrower containing such terms and written by such companies as may be satisfactory to the Bank, such insurance to be payable to the Bank as its interest may appear in the event of loss and to name the Bank as insured pursuant to a standard loss payee clause; no loss shall be adjusted thereunder without the Bank's approval; and all such policies shall provide that they may not be canceled without first giving at least Thirty (30) days written notice of cancellation to the Bank. In the event that the Borrower fails to provide evidence of such insurance, the Bank may, at its option, secure such insurance and charge the cost thereof to the Borrower. At the option of the Bank, all insurance proceeds received from any loss or damage to any of the Collateral shall be applied either to the replacement or repair thereof or as a payment on account of the Obligations. From and after the occurrence of an Event of Default, the Bank is authorized to cancel any insurance maintained hereunder and apply any returned or unearned premiums, all of which are hereby assigned to the Bank, as a payment on account of the Obligations.

4.11 Notification of Default. Immediately upon becoming aware of the existence of any condition or event which constitutes an Event of Default, or any condition or event which would upon notice or lapse of time, or both, constitute an Event of Default, Borrower shall give Bank written notice thereof specifying the nature and duration thereof and the action being or proposed to be taken with respect thereto.

4.12 Notification of Material Litigation. Borrower will immediately notify the Bank in writing of any litigation or of any investigative proceedings of a governmental agency or authority commenced or threatened against it which would or might be materially adverse to the financial condition of Borrower or any guarantor of the Obligations.

4.13 Pension Plans. With respect to any pension or benefit plan maintained by Borrower, or to which Borrower contributes ("Plan"), the benefits under which are guaranteed, in whole or in part, by the Pension Benefit Guaranty Corporation created by the Employee Retirement Income Security Act of 1974, P.L. 93-406, as amended ("ERISA") or any governmental authority succeeding to any or all of the functions of the Pension Benefit Guaranty Corporation ("Pension Benefit Guaranty Corporation"), Borrower will (a) fund each Plan as required by the provisions of Section 412 of the Internal Revenue Code of 1986, as amended; (b) cause each Plan to pay all benefits when due; (c) furnish Bank (i) promptly with a copy of any notice of each Plan's termination sent to the Pension Benefit Guaranty Corporation (ii) no later than the date of submission to the Department of Labor or to the Internal Revenue Service, as the case may be, a copy of any request for waiver from the funding standards or extension of the amortization periods required by Section 412 of the Internal Revenue Code of 1986, as amended and (iii) notice of any Reportable Event as such term is defined in ERISA; and (d) subscribe to any contingent liability insurance provided by the Pension Benefit Guaranty Corporation to protect against employer liability upon termination of a guaranteed pension plan, if available to Borrower.

## 5. NEGATIVE COVENANTS

5.1 Financial Covenants. The Borrower will not at any time or during any fiscal period (as applicable) fail to be in compliance with any of the financial covenants in this section.

(a) Definitions. The following definitions shall apply to this Section:

(i) "GAAP" shall mean generally accepted accounting principles in effect from time to time in

the United States.

(b) Cash Flow Leverage. A cash flow leverage of <= 4 shall be required for the life of the loan and tested annually beginning December 31, 2018.

(c) Post- Distribution Combined Debt Service Coverage Ratio of 1.10x. Defined as CDSCR for the life of the loan and tested annually beginning December 31, 2018

(d) Pre- Distribution Combined DSCR of 1.25x. Defined as CDSCR for the life of the loan and tested annually beginning December 31, 2018

5.2 Limitations on Indebtedness. Borrower shall not issue any evidence of indebtedness or create, assume, guarantee, become contingently liable for, or suffer to exist indebtedness in addition to indebtedness to the Bank, except indebtedness or liabilities of Borrower, other than for money borrowed, incurred or arising in the ordinary course of business.

5.3 Sale of Interest. There shall not be any sale or transfer of ownership of any interest in the Borrower without the Bank's prior written consent.

5.4 Loans or Advances. Borrower shall not make any loans or advances to any individual, partnership, corporation, limited liability company, trust, or other organization or person, including without limitation its officers and employees; provided, however, that Borrower may make advances to its employees, including its members, officers, with respect to expenses incurred or to be incurred by such employees in the ordinary course of business which expenses are reimbursable by Borrower; and provided further, however, that Borrower may extend credit in the ordinary course of business in accordance with customary trade practices.

5.5 Distributions. Borrower shall not, without prior written permission of the Bank, make any distribution to any of Borrower's members or managers in cash or in property or redeem, purchase or otherwise acquire, directly or indirectly, any interests, provided, so long as Borrower is not in default hereunder, distributions to the members of Borrower in such amounts as are necessary to pay the tax liability of such members due as a result of such members' interest in the Borrower.

5.6 Investments. The Borrower shall not make investments in, or advances to, any individual, partnership, corporation, limited liability company, trust or other organization or person. The Borrower will not purchase or otherwise invest in or hold securities, nonoperating real estate or other nonoperating assets or purchase all or substantially all the assets of any entity.

5.7 Merger. Borrower shall not merge or consolidate or be merged or consolidated with or into any other entity.

5.8 Capital Expenditures. The Borrower shall not, directly or indirectly, make or commit to make capital expenditures by lease, purchase, or otherwise, except in the ordinary and usual course of business for the purpose of replacing machinery, equipment or other personal property which, as a consequence of wear, duplication or obsolescence, is no longer used or necessary in the Borrower's business.

5.9 Sale of Assets. Borrower shall not sell, lease or otherwise dispose of any of its assets, except in the ordinary and usual course of business and except for the purpose of replacing machinery, equipment or other personal property which, as a consequence of wear, duplication or obsolescence, is no longer used or necessary in the Borrower's business, provided that fair consideration is received therefor; provided, however, in no event shall the Borrower sell, lease or otherwise dispose of any equipment purchased with the proceeds of any loans made by the Bank.

5.10 Restriction on Liens. Borrower shall not grant any security interest in, or mortgage of, any of its properties or assets including the Collateral. Borrower shall not enter into any agreement with any person other than the Bank that prohibits the Borrower from granting any security interest in, or mortgage of, any of its properties or assets including the Collateral.

5.11 Other Business. Borrower shall not engage in any business other than the business in which it is currently engaged or a business reasonably allied thereto.

5.12 Change of Name, etc. Borrower shall not change its legal name or the State or the type of its formation, without giving the Bank at least 30 days prior written notice thereof.

## 6. DEFAULT

6.1 Default. "Event of Default" shall mean the occurrence of one or more of any of the following events:

(a) default of any liability, obligation, covenant or undertaking of the Borrower or any guarantor of the Obligations to the Bank, hereunder or otherwise, including, without limitation, failure to pay in full and when due any installment of principal or interest or default of the Borrower or any

guarantor of the Obligations under any other Loan Document or any other agreement with the Bank;

(b) failure of the Borrower or any guarantor of the Obligations to maintain aggregate collateral security value satisfactory to the Bank;

(c) default of any material liability, obligation or undertaking of the Borrower or any guarantor of the Obligations to any other party;

(d) if any statement, representation or warranty heretofore, now or hereafter made by the Borrower or any guarantor of the Obligations in connection with this Agreement or in any supporting financial statement of the Borrower or any guarantor of the Obligations shall be determined by the Bank to have been false or misleading in any material respect when made;

(e) if the Borrower or any guarantor of the Obligations is a corporation, trust, partnership or limited liability company, the liquidation, termination or dissolution of any such organization, or the merger or consolidation of such organization into another entity, or its ceasing to carry on actively its present business or the appointment of a receiver for its property;

(f) the death of the Borrower or any guarantor of the Obligations and, if the Borrower or any guarantor of the Obligations is a partnership or limited liability company, the death of any partner or member;

(g) the institution by or against the Borrower or any guarantor of the Obligations of any proceedings under the Bankruptcy Code 11 USC §101 et seq. or any other law in which the Borrower or any guarantor of the Obligations is alleged to be insolvent or unable to pay its debts as they mature, or the making by the Borrower or any guarantor of the Obligations of an assignment for the benefit of creditors or the granting by the Borrower or any guarantor of the Obligations of a trust mortgage for the benefit of creditors;

(h) the service upon the Bank of a writ in which the Bank is named as trustee of the Borrower or any guarantor of the Obligations;

(i) a judgment or judgments for the payment of money shall be rendered against the Borrower or any guarantor of the Obligations, and any such judgment shall remain unsatisfied and in effect for any period of thirty (30) consecutive days without a stay of execution;

(j) any levy, lien (including mechanics lien), seizure, attachment, execution or similar process shall be issued or levied on any of the property of the Borrower or any guarantor of the Obligations;

(k) the termination or revocation of any guaranty of the Obligations; or

(l) the occurrence of such a change in the condition or affairs (financial or otherwise) of the Borrower or any guarantor of the Obligations, or the occurrence of any other event or circumstance, such that the Bank, in its sole discretion, deems that it is insecure or that the prospects for timely or full payment or performance of any obligation of the Borrower or any guarantor of the Obligations to the Bank has been or may be impaired.

8.2 Acceleration. If an Event of Default shall occur, at the election of the Bank, all Obligations shall become immediately due and payable without notice or demand, except with respect to Obligations payable on DEMAND, which shall be due and payable on DEMAND, whether or not an Event of Default has occurred.

The Bank is hereby authorized, at its election, after an Event of Default or after Demand, without any further demand or notice except to such extent as notice may be required by applicable law, to take possession and/or sell or otherwise dispose of all or any of the Collateral at public or private sale; and the Bank may also exercise any and all other rights and remedies of a secured party under the Code or which are otherwise accorded to it in equity or at law, all as Bank may determine, and such exercise of rights in compliance with the requirements of law will not be considered adversely to affect the commercial reasonableness of any sale or other disposition of the Collateral. If notice of a sale or other action by the Bank is required by applicable law, unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, the Borrower agrees that ten (10) days written notice to the Borrower, or the shortest period of written notice permitted by such law, whichever is smaller, shall be sufficient notice; and that to the extent permitted by law, the Bank, its officers, attorneys and agents may bid and become purchasers at any such sale, if public, and may purchase at any private sale any of the Collateral that is of a type customarily sold on a recognized market or which is the subject of widely distributed standard price quotations. Any sale (public or private) shall be without warranty and free from any right of redemption, which the Borrower shall waive and release after default upon the Bank's request therefor, and may be free of any warranties as to the Collateral if Bank shall so decide. No purchaser at any sale (public or private) shall be responsible for the application of the purchase money. Any balance of the net proceeds of sale remaining after paying all Obligations of the Borrower to the Bank shall be returned to such other party as may be legally entitled thereto; and if there is a deficiency, the Borrower shall be responsible for repayment of the same, with interest. Upon demand by

the Bank, the Borrower shall assemble the Collateral and make it available to the Bank at a place designated by the Bank which is reasonably convenient to the Bank and the Borrower. The Borrower hereby acknowledges that the Bank has extended credit and other financial accommodations to the Borrower upon reliance of the Borrower's granting the Bank the rights and remedies contained in this Agreement including without limitation the right to take immediate possession of the Collateral upon the occurrence of an Event of Default or after DEMAND with respect to Obligations payable on DEMAND and the Borrower hereby acknowledges that the Bank is entitled to equitable and injunctive relief to enforce any of its rights and remedies hereunder or under the Code and the Borrower hereby waives any defense to such equitable or injunctive relief based upon any allegation of the absence of irreparable harm to the Bank.

The Bank shall not be required to marshal any present or future security for (including but not limited to this Agreement and the Collateral subject to the security interest created hereby), or guaranties of, the Obligations or any of them, or to resort to such security or guaranties in any particular order; and all of its rights hereunder and in respect of such securities and guaranties shall be cumulative and in addition to all other rights, however existing or arising. To the extent that it lawfully may do so, the Borrower hereby agrees that it will not invoke and irrevocably waives the benefits of any law relating to the marshaling of collateral which might cause delay in or impede the enforcement of the Bank's rights under this Agreement or under any other instrument evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or guaranteed. Except as required by applicable law, the Bank shall have no duty as to the collection or protection of the Collateral or any income thereon, nor as to the preservation of rights against prior parties, nor as to the preservation of any rights pertaining thereto beyond the safe custody thereof.

6.3 Power of Attorney. The Borrower hereby irrevocably constitutes and appoints the Bank as the Borrower's true and lawful attorney, with full power of substitution, at the sole cost and expense of the Borrower but for the sole benefit of the Bank, upon the occurrence of an Event of Default or after DEMAND with respect to Obligations payable on DEMAND, to convert the Collateral into cash, including, without limitation, completing the manufacture or processing of work in process, and the sale (either public or private) of all or any portion or portions of the inventory and other Collateral; to enforce collection of the Collateral, either in its own name or in the name of the Borrower, including, without limitation, executing releases or waivers, compromising or settling with any Debtors and prosecuting, defending, compromising or releasing any action relating to the Collateral; to receive, open and dispose of all mail addressed to the Borrower and to take therefrom any remittances or proceeds of Collateral in which the Bank has a security interest; to notify Post Office authorities to change the address for delivery of mail addressed to the Borrower to such address as the Bank shall designate; to endorse the name of the Borrower in favor of the Bank upon any and all checks, drafts, money orders, notes, acceptances or other instruments of the same or different nature; to sign and endorse the name of the Borrower on and to receive as secured party any of the Collateral, any invoices, freight or express receipts, or bills of lading, storage receipts, warehouse receipts, or other documents of title of the same or different nature relating to the Collateral; to sign the name of the Borrower on any notice of the Debtors or on verification of the Collateral; and to sign, if necessary, and file or record on behalf of the Borrower any financing or other statement in order to perfect or protect the Bank's security interest. The Bank shall not be obliged to do any of the acts or exercise any of the powers hereinabove authorized, but if the Bank elects to do any such act or exercise any such power, it shall not be accountable for more than it actually receives as a result of such exercise of power, and it shall not be responsible to the Borrower except for its own gross negligence or willful misconduct. All powers conferred upon the Bank by this Agreement, being coupled with an interest, shall be irrevocable so long as any Obligation of the Borrower or any guarantor or surety to the Bank shall remain unpaid or the Bank is obligated under this Agreement to extend any credit to the Borrower.

6.4 Nonexclusive Remedies. All of the Bank's rights and remedies not only under the provisions of this Agreement but also under any other agreement or transaction shall be cumulative and not alternative or exclusive, and may be exercised by the Bank at such time or times and in such order of preference as the Bank in its sole discretion may determine.

## 7. MISCELLANEOUS

7.1 Waivers. The Borrower waives notice of intent to accelerate, notice of acceleration, notice of nonpayment, demand, presentment, protest or notice of protest of the Obligations, and all other notices, consents to any renewals or extensions of time of payment thereof, and generally waives any and all suretyship defenses and defenses in the nature thereof.

7.2 Waiver of Homestead. To the maximum extent permitted under applicable law, the Borrower hereby waives and terminates any homestead rights and/or exemptions respecting any of its property under the provisions of any applicable homestead laws, including without limitation, Chapter 188, Section 1, of the General Laws of Massachusetts.

7.3 Deposit Collateral. The Borrower hereby grants to the Bank a continuing lien and security interest in any and all deposits or other sums at any time credited by or due from the Bank to the Borrower and any cash, securities, instruments or other property of the Borrower in the possession of the Bank, whether for safekeeping or otherwise, or in transit to or from the Bank (regardless of the reason the Bank had received the same or whether the Bank has conditionally released the same) as security for the full and punctual payment and performance of all of the liabilities and obligations of the Borrower to the Bank and such

deposits and other sums may be applied or set off against such liabilities and obligations of the Borrower to the Bank at any time, whether or not such are then due, whether or not demand has been made and whether or not other collateral is then available to the Bank.

7.4 Indemnification. The Borrower shall indemnify, defend and hold the Bank and its directors, officers, employees, agents and attorneys (each an "Indemnitee") harmless of and from any claim brought or threatened against any Indemnitee by the Borrower, any guarantor or endorser of the Obligations, or any other person (as well as from reasonable attorneys' fees and expenses in connection therewith) on account of the Bank's relationship with the Borrower, or any guarantor or endorser of the Obligations (each of which may be defended, compromised, settled or pursued by the Bank with counsel of the Bank's election, but at the expense of the Borrower), except for any claim arising out of the gross negligence or willful misconduct of the Bank. The within indemnification shall survive payment of the Obligations, and/or any termination, release or discharge executed by the Bank in favor of the Borrower.

7.5 Costs and Expenses. The Borrower shall pay to the Bank on demand any and all costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements, court costs, litigation and other expenses) incurred or paid by the Bank in establishing, maintaining, protecting or enforcing any of the Bank's rights or the Obligations, including, without limitation, any and all such costs and expenses incurred or paid by the Bank in defending the Bank's security interest in, title or right to the Collateral or in collecting or attempting to collect or enforcing or attempting to enforce payment of the Obligations.

7.6 Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be an original, but all of which shall constitute but one agreement.

7.7 Severability. If any provision of this Agreement or portion of such provision or the application thereof to any person or circumstance shall to any extent be held invalid or unenforceable, the remainder of this Agreement (or the remainder of such provision) and the application thereof to other persons or circumstances shall not be affected thereby.

7.8 Complete Agreement. This Agreement and the other Loan Documents constitute the entire agreement and understanding between and among the parties hereto relating to the subject matter hereof, and supersedes all prior proposals, negotiations, agreements and understandings among the parties hereto with respect to such subject matter.

7.9 Binding Effect of Agreement. This Agreement shall be binding upon and inure to the benefit of the respective heirs, executors, administrators, legal representatives, successors and assigns of the parties hereto, and shall remain in full force and effect (and the Bank shall be entitled to rely thereon) until released in writing by the Bank. The Bank may transfer and assign this Agreement and deliver the Collateral to the assignee, who shall thereupon have all of the rights of the Bank; and the Bank shall then be relieved and discharged of any responsibility or liability with respect to this Agreement and the Collateral. The Borrower may not assign or transfer any of its rights or obligations under this Agreement. Except as expressly provided herein or in the other Loan Documents, nothing, expressed or implied, is intended to confer upon any party, other than the parties hereto, any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.

7.10 Further Assurances. Borrower will from time to time execute and deliver to Bank such documents, and take or cause to be taken, all such other or further action, as Bank may request in order to effect and confirm or vest more securely in Bank all rights contemplated by this Agreement and the other Loan Documents (including, without limitation, to correct clerical errors) or to vest more fully in or assure to the Bank the security interest in the Collateral granted to the Bank by this Agreement or to comply with applicable statute or law and to facilitate the collection of the Collateral (including, without limitation, the execution of stock transfer orders and stock powers, endorsement of promissory notes and instruments and notifications to obligors on the Collateral). To the extent permitted by applicable law, Borrower authorizes the Bank to file financing statements, continuation statements or amendments, and any such financing statements, continuation statements or amendments may be filed at any time in any jurisdiction. Bank may at any time and from time to time file financing statements, continuation statements and amendments thereto which contain any information required by the Code for the sufficiency of filing office acceptance of any financing statement, continuation statement or amendment, including whether Borrower is an organization, the type of organization and any organization identification number issued to Borrower. Borrower agrees to furnish any such information to Bank promptly upon request. In addition, Borrower shall at any time and from time to time take such steps as Bank may reasonably request for Bank (i) to obtain an acknowledgment, in form and substance satisfactory to Bank, of any bailee having possession of any of the Collateral that the bailee holds such Collateral for Bank, (ii) to obtain "control" (as defined in the Code) of any Collateral comprised of deposit accounts, electronic chattel paper, letter of credit rights or investment property, with any agreements establishing control to be in form and substance satisfactory to Bank, and (iii) otherwise to insure the continued perfection and priority of Bank's security interest in any of the Collateral and the preservation of its rights therein. Borrower hereby constitutes Bank its attorney-in-fact to execute, if necessary, and file all filings required or so requested for the foregoing purposes, all acts of such attorney being hereby ratified and confirmed; and such power, being coupled with an interest, shall be irrevocable until this Agreement terminates in accordance with its terms, all Obligations are irrevocably paid in full and the Collateral is released.

7.11. Amendments and Waivers. This Agreement may be amended and Borrower may take any action herein prohibited, or omit to perform any act herein required to be performed by it, if Borrower shall obtain the Bank's prior written consent to each such amendment, action or omission to act. No course of dealing and no delay or omission on the part of Bank in exercising any right hereunder shall operate as a waiver of such right or any other right and waiver on any one or more occasions shall not be construed as a bar to or waiver of any right or remedy of Bank on any future occasion.

7.12. Term of Agreement. This Agreement shall continue in full force and effect so long as any Obligations or obligation of Borrower to Bank shall be outstanding, or the Bank shall have any obligation to extend any financial accommodation hereunder, and is supplementary to each and every other agreement between Borrower and Bank and shall not be so construed as to limit or otherwise derogate from any of the rights or remedies of Bank or any of the liabilities, obligations or undertakings of Borrower under any such agreement, nor shall any contemporaneous or subsequent agreement between Borrower and the Bank be construed to limit or otherwise derogate from any of the rights or remedies of Bank or any of the liabilities, obligations or undertakings of Borrower hereunder, unless such other agreement specifically refers to this Agreement and expressly so provides.

7.13 Notices. Any notice under or pursuant to this Agreement shall be a signed writing or other authenticated record (within the meaning of Article 9 of the Code). Any notices under or pursuant to this Agreement shall be deemed duly received and effective if delivered in hand to any officer or agent of the Borrower or Bank, or if mailed by registered or certified mail, return receipt requested, addressed to the Borrower or Bank at the address set forth in this Agreement or as any party may from time to time designate by written notice to the other party.

7.14 Governing Law. This Agreement shall be governed by the laws of the Commonwealth of Massachusetts.

7.15 Reproductions. This Agreement and all documents which have been or may be hereinafter furnished by Borrower to the Bank may be reproduced by the Bank by any photographic, photostatic, microfilm, xerographic or similar process, and any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made in the regular course of business).

7.16 Jurisdiction and Venue. Borrower irrevocably submits to the nonexclusive jurisdiction of any Federal or state court sitting in Massachusetts, over any suit, action or proceeding arising out of or relating to this Agreement. Borrower irrevocably waives, to the fullest extent it may effectively do so under applicable law, any objection it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that the same has been brought in an inconvenient forum. Borrower hereby consents to any and all process which may be served in any such suit, action or proceeding: (i) by mailing a copy thereof by registered and certified mail, postage prepaid, return receipt requested, to the Borrower's address shown in this Agreement or as notified to the Bank and (ii) by serving the same upon the Borrower in any other manner otherwise permitted by law, and agrees that such service shall in every respect be deemed effective service upon Borrower.

7.17 JURY WAIVER. THE BORROWER AND BANK EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, AND AFTER AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL, (A) WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING IN CONNECTION WITH THIS AGREEMENT, THE OBLIGATIONS, ALL MATTERS CONTEMPLATED HEREBY AND DOCUMENTS EXECUTED IN CONNECTION HEREWITH AND (B) AGREE NOT TO SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE, OR HAS NOT BEEN, WAIVED. THE BORROWER CERTIFIES THAT NEITHER THE BANK NOR ANY OF ITS REPRESENTATIVES, AGENTS OR COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE BANK WOULD NOT IN THE EVENT OF ANY SUCH PROCEEDING SEEK TO ENFORCE THIS WAIVER OF RIGHT TO TRIAL BY JURY.

Executed as an instrument under seal as of July 26, 2018.

Witness:

[signature]

Borrower:
Bancroft Holding LLC

By: [signature]
Scott Duncan, Manager

Accepted: Avidia Bank

By: [signature]
Name: Joseph G. Sova
Title: Senior Vice President

kingfish capital advisors, llc
certified appraisals for industry

Effective Date: 7 January 2025
Report Date: 8 January 2025

Subject:
Bancroft Holding, LLC d/b/a
F&M Tool and Die
851 Sterling Rd
Lancaster, MA 01523

| **Recapitulation of Value by Asset Category** | **FMV[1]** | **OLV[2]** |
|---|---|---|
| *CNC Machine Tools* | | |
| CNC Machining Centers | $203,400.00 | $169,200.00 |
| CNC Lathes | $50,500.00 | $41,500.00 |
| CNC Grinders | $76,500.00 | $63,000.00 |
| CNC Tooling Cabinets & Toolholders | $159,150.00 | $113,250.00 |
| CNC Electronic Dishcarge Machines (EDM's) | $221,300.00 | $186,000.00 |
| Metrology Equipment | $19,100.00 | $15,500.00 |
| Conventional Machine Shop Equipment | $49,400.00 | $39,700.00 |
| Material Handling & Process Equipment | $50,500.00 | $42,000.00 |
| Miscellaneous Equipment | $35,000.00 | $27,200.00 |
| **FMV Listed Equipment** | **$864,850.00** | |
| **OLV Listed Equipment** | | **$697,350.00** |

[1]Fair Market Value: An opinion expressed in terms of money, at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts, as of a specific date.

[2]Orderly Liquidation Value ("OLV") is defined as : An opinion of the gross amount, expressed in terms of money, that typically could be realized from a liquidation sale, given a reasonable period of time to find a purchaser (or purchasers), with the seller being compelled to sell on an as-is, where-is basis, as of a specific date.

Source: *Valuing Machinery and Equipment, The Fundamentals of Appraising Machinery & Technical Assets Fourth Edition,* Machinery & Technical Specialties Committee of the American Society of Appraisers June 2020

Subject to Statement of Limiting Conditions

Addenda A: Recapitulation of Value
Page 1

Intended Use: Bank Decision Making, Any other use is incidental and may be misleading.

kingfish capital advisors, llc
certified appraisals for industry

Effective Date: 7 January 2025
Report Date: 8 January 2025

Subject:
Bancroft Holding, LLC d/b/a
F&M Tool and Die
851 Sterling Rd
Lancaster, MA 01523

| Qty | Image | Asset Description: | Model | SN | Condition | FMV[1] | OLV[2] |
|---|---|---|---|---|---|---|---|
| | | **CNC Machine Tools** | | | | | |
| | | **Vertical Machining Centers, CNC Lathes, CNC Grinders** | | | | | |
| 1 | 307-1720 | 2014 Fanuc Robodrill CNC Mill, 14 Station Turret, Fanuc Series 31i Model B5 Controls | D14MiA5 | P1434A751 | Good | $32,000.00 | $26,000.00 |
| 1 | 307-1715 | 2012 Sharp CNC Vertical Machining Center, Fanuc Series Oi-MD Controls, 24 Tool Changer, Flood Coolant System, 22.5 HP 12,000 RPM High Speed Spindle; 11,674 Hours. | SV-4328SX | | Good | $52,000.00 | $41,000.00 |
| 1 | 307-1703 | 2011 Sharp CNC Mill, Fanuc Series Oi-MD Controls, 40 Tool Changer Carousel, Spindle Chiller, 4' x 6' Table, Harbor Chiller, 1,340 Hrs | SVG-6332A | 214088 | Good | $54,000.00 | $46,000.00 |
| 1 | 307-1716 | 2005 OKK CNC Mill, Neomatic 635V CNC Controls, 2' x 4' T Slot Table, Handy Pulser | VP600 | 201 | Good- 21,000 Hrs | $18,000.00 | $15,000.00 |
| 1 | 307-1696 | 2001 Haas Mini Mill CNC Mill, 40 Taper Spindle, Auto Tool Changer; 1,729 Hrs. | S | 26450 | Good | $12,000.00 | $10,500.00 |
| 1 | 307-1697 | 2000 Haas Mini Mill CNC Mill, 4th Axis, 40 Taper Spindle | HA5C | 22635 | Good | $14,200.00 | $12,200.00 |
| 1 | 307-1695 | 1997 Trak 3 Axis CNC Knee Mill, Trak A.G.E, 3 Auto Geometry, 3 Axis Engine | DPM | 97-2883 | Good | $16,000.00 | $14,500.00 |
| 1 | 307-1724 | Acer 2 Axis Knee Mill with ProtoTrak Mx2 2 Axis CNC Controls | | 4450 | Good | $5,200.00 | $4,000.00 |
| | | **Total CNC Machining Centers** | | | | **$203,400.00** | **$169,200.00** |
| | | **CNC Lathes** | | | | | |
| 1 | 307-1699 307-1700 | 1998 Mori Seiki Slant Bed Lathe, Mori Seiki MSC 500 CNC Controls, 12 Station Turret, Chip Conveyor, Live Tail Stock, Chip Blaster, Aercology Mist Buster, Matsumoto Chuck Cylinder System, Kel-Vista UR 175/1000 Cylindrical Grinder S/N 675177, GE Fanuc Series 21i-T CNC Controls, Steady Rests; 7,325 Hrs. | SL-200 | | Good | $23,000.00 | $18,500.00 |
| 1 | 307-1702 | 2008 Haas Lathe, Haas Controls, 12 Station Turret, Live Tooling, Foot Pedal Controls | SL-10 | 3080995 | Good | $27,500.00 | $23,000.00 |
| | | **Totals CNC Lathes** | | | | **$50,500.00** | **$41,500.00** |
| | | **CNC Reciprocating and Universal Surface Grinders** | | | | | |
| 1 | 307-1683 | 2016 Kent Hydraulic Reciprocating Surface Grinder, Auto Feed Kansatsu 16 x 40 Chuck, Paper Filter, Wet Attachment, Hydraulic Power Plant | SGS-1640AHD | 105004 | Good | $23,500.00 | $18,500.00 |
| 1 | 307-1684 | 2007 Okamoto Grinder, CNC Controls, Wet Attachment, 4.96 Hp, Spindle Drive | ACC-12-24 DX | 64385 | Good | $21,000.00 | $18,000.00 |
| 1 | | 2007 Kellenberger CNC Universal Grinder 3 Spindle Wheelhead, OD Straight, OD Angle, 13.78" Swing, 40" on Center, Coolant System, Fanuc 21iT Controls, 7,000 hrs. | Del Vista UR 175-1000 | | Good | $32,000.00 | $26,500.00 |
| | | **Totals CNC Grinding Machines** | | | | **$76,500.00** | **$63,000.00** |

Subject to Statement of Limiting Conditions

Addenda B: Equipment Values
Page 1

Intended Use: Bank Decision Making only. Any other use is incidental and may be misleading.

kingfish capital advisors, llc
certified appraisals for industry

Effective Date: 7 January 2025
Report Date: 8 January 2025

Subject:
Bancroft Holding, LLC d/b/a
F&M Tool and Die
851 Sterling Rd
Lancaster, MA 01523

| Qty | Image | Asset Description: | Model | SN | Condition | FMV[1] | OLV[2] |
|---|---|---|---|---|---|---|---|
| | | **CNC Tooling Cabinets and Toolholders** | | | | | |
| Group | | Zoller Tool setting Equipment, Cabinets, Organizers, and transferable license | | | | | |
| 1 | 307-1721 | Zoller SMILE Tool Presetter - Windows 10 | SMILE | SMILE240X-01958 | Excellent | $45,000.00 | $38,000.00 |
| 1 | | Zoller Keeper Tooling Cabinet | TMS Hardware | WSTOE-00458 | Excellent | | |
| 1 | | Zoller Tool Organizer | | | Excellent | | |
| 1 | | 2020 Abnox Rigo Fix PowRgrip tooling dampening system | PGU-9500 | 5680220 C3 | Excellent | $7,900.00 | $6,500.00 |
| Group | | Appx. 350 CAT40 Taper CNC Tooling, CAT 50 Taper Tooling | | | Very Good | $96,250.00 | $61,250.00 |
| Group | | Appx 250 System 3R Graphite Tool Holders | | | Good | $10,000.00 | $7,500.00 |
| | | **Totals CNC Tooling Cabinets and Toolholders** | | | | **$159,150.00** | **$113,250.00** |
| | | **CNC Travelling Wire EDM's, Sinker EDM's** | | | | | |
| 1 | 307-1698 | 2014 Sodick AD55L Sinker EDM, Sodick Electric Oil Cooler, 10 x 18 Ceramax Magnetic Chuck System, 3R Tooling, Auto Tool Changer, Orbiting Ram | LN2/LP55L | Tool | Good | $65,000.00 | $58,000.00 |
| 1 | 307-1689 | 2012 Versamax Hole Drill EDM with Water Filter, CNC Controls | FHD26M | 125059 | | $10,800.00 | $8,000.00 |
| 1 | 307-1690 | 2011 Makino Wire EDM, Makino MGW-S6 CNC Controls | DUO64 | W13017J | | $38,500.00 | $32,000.00 |
| 1 | 307-1692 | 2011 Makino Wire EDM, Makino MGW-S6 CNC Controls | DUO64 | W130166 | | $38,500.00 | $32,000.00 |
| 1 | 307-1691 | 2011 Makino Wire EDM, Makino MGW-S6 CNC Controls, Hand Held Pendant Control[3] | DUO43 | W20317 | Under Repair | $30,000.00 | $25,500.00 |
| 1 | 307-1693 | 2011 Makino Wire EDM, Makino MGW-S6 CNC Controls, Hand Held Pendant Control | DUO43 | W20315 | | $30,000.00 | $25,500.00 |
| 1 | 307-1964 | 2001 Agie Mondo Star 50 CNC Sinker EDM with Futura V Solid State Power Pack M/T, Capacitor Option, C Axis Assembly, Tool Changer, Walker 10 x 8 Magnetic Chuck | | 327 | | $8,500.00 | $5,000.00 |
| | | **Totals CNC Electronic Discharge Machines** | | | | **$221,300.00** | **$186,000.00** |
| | | **Meteorology and CNC Measuring Equipment** | | | | | |
| 1 | 307-1701 | Trimos/Fowler Digital Height Gage "Vertical 3" | TVA 600 | 12402/TD:5 | | $4,200.00 | $3,600.00 |
| Group | | Wilson 3R Hardness Tester, Swing Arm Stereo Microscope, (2) Digi Check Height Gages | | 3R 1838 | | $3,100.00 | $2,900.00 |
| 1 | 307-1703 | Micro-Vu Video Measuring System with CCTV, FD-10 Focus Detector DTK PC, Dell Flat Screen Display | M301 | 6362 | | $3,600.00 | $2,500.00 |
| 1 | 307-1704 | Nordson Pulse Jetter | MV-100 | | Good | $8,200.00 | $6,500.00 |
| | | **Total Meteorology and CNC Measuring Equipment** | | | | **$19,100.00** | **$15,500.00** |

Subject to Statement of Limiting Conditions

Addenda B: Equipment Values
Page 2

Intended Use: Bank Decision Making only. Any other use is incidental and may be misleading.

kingfish capital advisors, llc
certified appraisals for industry

Effective Date: 7 January 2025
Report Date: 8 January 2025

Subject:
Bancroft Holding, LLC d/b/a
F&M Tool and Die
851 Sterling Rd
Lancaster, MA 01523

| Qty | Image | Asset Description: | Model | SN | Condition | FMV[1] | OLV[2] |
|---|---|---|---|---|---|---|---|
| | | **Conventional Machine Shop & Shop Support Equipment** | | | | | |
| 1 | 307-1688 | 1974 Grob Vertical Band Saw with Welding Attachment | 4V-18 | 2079 | | $4,500.00 | $3,900.00 |
| 1 | | Ramco 55 Ton Shop Press | RP55 | 541 | | $1,500.00 | $1,000.00 |
| 1 | 307-1706 | Hardinge Turret Lathe, Speed Feed, Quick Change Collet | | | | $7,500.00 | $5,800.00 |
| 7 | | Lista Tool Cabinets | | | | $10,500.00 | $7,000.00 |
| 1 | | 1983 Bridgeport Series 1 Mill, 2 Hp | | 12/BR 234360 | | $5,500.00 | $5,000.00 |
| 1 | 307-1709 | 1983 Bridgeport Series 1 Mill with Prototrak Mx2 2 Axis CNC Controls | | BR258478 | | $8,900.00 | $8,000.00 |
| 1 | | 1985 Bridgeport Series 1 Mill, 2 Hp, Accurite DRO | | 12/BR 234327 | | $5,500.00 | $5,000.00 |
| 1 | | Milton Horizontal Band Saw, 1" x .035" x .135" | 7040 | 109254 | | $1,200.00 | $1,000.00 |
| 1 | 307-1685 | 2019 IPSCO Pin Cut Off and Grind Machine | PCO-2 | 52 | | $1,500.00 | $1,000.00 |
| 1 | | 2005 Chevalier Hand Grinder, 6x18 Chuck, Accurite DRO, Wet Attachment | FSG-618M | A380C038 | | $2,800.00 | $2,000.00 |
| | | **Totals Conventional Machine Shop & Shop Support Equipment** | | | | **$49,400.00** | **$39,700.00** |
| | | **Material Handling & Process Equipment** | | | | | |
| 1 | 307-1707 | 2023 Spanco 3 Ton Gantry Crane with Budgit 3 Ton Electric Hoist | 3A1012 | | | $9,000.00 | $8,100.00 |
| 1 | 307-1708 | Shop Built Crane System with (2) 16' Mass Crane 5 Ton Beams, Self Propelled REM Undersilung 5 Ton Hoists, N/S/E/W, 3 Shop Fabrication 1/2" Steel I Beam Supports | | | | $10,000.00 | $8,500.00 |
| 1 | | TCM Propane Forklift, 8,000 Lb. Capacity, Sideshifter | FGC36N7T | A28UE0212 | 13,440 hours | $12,000.00 | $10,000.00 |
| 1 | 307-1710 | 2008 Compressed Air System Ingersoll Rand 25 Hp Screw Type Rotary Compressor with 125 Gallon Welded Steel Reservoir, 2008 Zeks Heat Sink Air Dryer Model 75HSGA100, S/N 318431 | IRN25H-CC-HV | CBV589615 | | $8,000.00 | $6,500.00 |
| 1 | 307-1711 | 2001 Gardner Denver Screw Air Compressor, Zeks Heat Sink Dryer, Water Extractor, 125 Gallon Welded Steel Reservoir | EBE99MX | ST04487 | | $4,000.00 | $3,500.00 |
| 1 | 307-1686 | Process Water Cooling System with 500 Gallon Tank, (2) 15 Hp Pumps, (2) 5 Hp Pumps, Parker OE37733.5 Filters | 4176-BW061711 | 53522-11/PRM | | $3,500.00 | $2,000.00 |
| 1 | 307-1717 | Factory Cat Floor Cleaner | Micro Hd | 104103 | | $4,000.00 | $3,400.00 |
| | | **Total Material Handling & Process Equipment** | | | | **$50,500.00** | **$42,000.00** |

Subject to Statement of Limiting Conditions

Addenda B: Equipment Values
Page 3

Intended Use: Bank Decision Making only. Any other use is incidental and may be misleading.

kingfish capital advisors, llc
certified appraisals for industry

Effective Date: 7 January 2025
Report Date: 8 January 2025

Subject:
Bancroft Holding, LLC d/b/a
F&M Tool and Die
851 Sterling Rd
Lancaster, MA 01523

| Qty | Image | Asset Description: | Model | SN | Condition | FMV[1] | OLV[2] |
|---|---|---|---|---|---|---|---|
| | | **Miscellaneous Equipment** | | | | | |
| 1 | 307-1712 | 2014 LaserStar Class 4 Laser Engraver with Articulating Arm and Positioner | 513-776-200-2 | 1405091 | | $5,000.00 | $4,200.00 |
| Group | | Injection Molding Machines | | | | | |
| 1 | 307-1726 | Cincinnati Injection Molding Machine | ROBO 110R-36 | 4066A01-91-1 | | $10,000.00 | $7,000.00 |
| 1 | 307-1724 | Cincinnati Injection Molding Machine | ROBO 110R-976 | 4066A01-94-8 | | | |
| 1 | 307-1728 | 1995 Van Dorn Ergo Tech Compact Injection Molder | 50 ET | 7141 0268 | | | |
| Group | | Surface Plates, Height Gages, Measurement Devices including Set Up Blocks. Spin Jigs, Tangent Dressers, Grinding Attachments, Micrometers, Granite Surface Plates, Drills, Tooling Inserts, Reamers, Go-No Go Gages, Gage Blocks, Plugs, and support equipment in Lista cabinet, Torit Dust Collectors, and miscellaneous equipment within the shop | | | | $20,000.00 | $16,000.00 |
| | | **Totals Miscellaneous Equipment** | | | | **$35,000.00** | **$27,200.00** |

[1]Fair Market Value: An opinion expressed in terms of money, at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts, as of a specific date.
[2]Orderly Liquidation Value ("OLV") is defined as : An opinion of the gross amount, expressed in terms of money, that typically could be realized from a liquidation sale, given a reasonable period of time to find a purchaser (or purchasers), with the seller being compelled to sell on an as-is, where-is basis, as of a specific date.
Source: Valuing Machinery and Equipment, The Fundamentals of Appraising Machinery & Technical Assets Fourth Edition, Machinery & Technical Specialties Committee of the American Society of Appraisers June 2020
[3]Valued under a Hypothetical Condition that the machine tool is repaired at a cost of $6,500.00

Subject to Statement of Limiting Conditions

Addenda B: Equipment Values
Page 4

Intended Use: Bank Decision Making only. Any other use is incidental and may be misleading.

Exhibit "I"

# WEDNESDAY, APRIL 30TH AT 10:00 A.M. (ET)

SODICK AD55L CNC SINKER EDM MACHINE

MAKINO DUO 43 CNC WIRE EDM MACHINE

MAKINO 64 CNC WIRE EDM MACHINE (1 OF 2)

AGIE MONDO STAR 50 CNC SINKER EDM MACHINE

## CNC SINKER EDM MACHINES

- **2014 Sodick AD55L** 3-Axis CNC Sinker EDM, 10" x 18" Magnetic Chuck, 6-Position Automatic Tool Changer, Coolant System, Sodick CNC Control, Mod. LN2, Type LP55L, S/N T0001 •
- **2001 Agie Mondo Star 50** CNC Sinker EDM, 20" x 10" Magnetic Chuck, Coolant System, Agie Futura V CNC Controls, S/N AF V 1PM-005425 •

## CNC WIRE EDM MACHINES

- **2011 Makino Duo 64** 3-Axis CNC Wire EDM, 36" x 26" Table, Makino MGW-S6 CNC Controls, S/N W130166, w/ Orion Chiller, Remote Control & Tooling •
- **2011 Makino Duo 64** 3-Axis CNC Wire EDM, 36" x 26" Tables, Makino MGW-S6 CNC Controls, S/N W130171, w/ Orion Chiller, Remote Control & Tooling •
- **2011 Makino Duo 43** 3-Axis CNC Wire EDM, 28' x 22" Table, Makino MGW-S6 CNC Controls, S/N W120317, w/ Orion Chiller & Remote Control •
- **2011 Makino Duo 43** 3-Axis CNC Wire EDM, 28' x 22" Table, Makino MGW-S6 CNC Controls S/N W120315, w/ Orion Chiller & Remote Control •

VERSAMAX FHD26M CNC EDM HOLE DRILL MACHINE

## CNC HOLE DRILL EDM MACHINE

- **2012 Versamax FHD26M** 3-Axis CNC Hole Drill EDM, S/N 125059, Coolant System, CNC Controls •

## CNC CYLINDRICAL GRINDER

- **2004 Kellenburger Kel-Vista U** 175/1000 CNC OD/ID Universal Cylindrical Grinder, 8" Chuck, 14" Swing x 40" B.C., Coolant System, GE Fanuc Series 21i-T CNC Controls, S/N 675177 •

## SURFACE GRINDERS

- **2016 Kent SGS-1640AHD** Automatic Surface Grinder, 16"x40" Magnetic Chuck, 2 H.P., S/N 105004, w/ Hydraulic Power Plant •
- **2007 Okamoto 12-24-DX** Surface Grinder, 12"x 24" Magnetic Chuck & Okamoto Controls, Mod. ACC-12-24-DX, S/N 64385 •
- **Chevalier FSG-618M** Surface Grinder, 6"x18" Magnetic Chuck, S/N A380C038, w/ D.R.O., (2005) •
- **Okamoto Linear 6-18** Surface Grinder, 6"x18" Magnetic Chuck, Mod. PFG618, S/N 84070 •

## GRINDING MACHINES

★ **2019 Ipsco Pin Cutoff & Grind Machine** ★

- **Black Diamond** Tool & Cutter Grinder, 1 Ph. •
- **Gorton 375-2** Tool & Cutter Grinder, 1 Ph. •
- **Alexander 20G** Tool & Cutter Grinder, 1 Ph. •
- **Michael Decker 50E** Single Lip Cutter Grinder •
- **Delta** Carbide Tool Grinder, #23-510, 3 Ph. •
- **Gesswein** 2-Station Multitool Grinder •
- **Delta** Pin Tech & Craftsman D.E. Bench Grinders •
- **Craftsman** 2" Belt/6" Disc Grinder, 1 Ph. •
- **TDR** Drill Sharpener/Carbide Grinder •
- **(2) Foredom** Flex Grinders, Etc., Etc. •

## BANDSAWS

- **Grob 18"** Vertical Bandsaw, 24"x28" Table, Mod. 4V-18, S/N 2079, w/ Weld & Cut Attachment •
- **Wilton 10"** x 16" Portable Horizontal Bandsaw, Mod. 7040S, S/N 109254 •

## LATHES

- **Hardinge HLV-H** Precision Tool Room Lathe, 12" Swing x 18" B.C., Tailstock, Cross Slide, Tool Holder, S/N 8220 •
- **Hardinge HC** Chucker, 15" Swing, 8-Position Turret Tool Holder, 1.5 H.P., S/N CHC 82204 •

GROB 18" VERTICAL BANDSAW

KELLENBERGER KEL-VISTA UR175-1000 CNC CYLINDRICAL GRINDER

KENT SGS-1640AHD SURFACE GRINDER

WILTON 10" X 16" HORIZONTAL BANDSAW

**Aaron Posnik**

**AUCTIONEERS • APPRAISERS**

MA Auc. Lic. #161 • Est. 1932 • PA Auc. Lic. #AY000241L

SECURED PARTY SALE BY

# PUBLIC AUCTION

LIVE ONSITE AND LIVE WEBCAST BIDDING

FACILITY CLOSED

## INJECTION MOLD MANUFACTURER

• CNC VERTICAL MACHINING CENTERS •
• CNC LATHES, GRINDERS & MILLERS •
• CNC EDM SINKER, WIRE & HOLE MACHINES •
• MACHINE TOOLS • TOOLING • INSPECTION EQUIPMENT •
• INJECTION MOLDING MACHINES •
• PLANT SUPPORT & OFFICE EQUIPMENT •

BANCROFT HOLDING LLC D/B/A

851 STERLING ROAD, LANCASTER, MASSACHUSETTS

TO BE SOLD ON THE PREMISES AND BY LIVE INTERNET BIDDING

WEDNESDAY, APRIL 30TH AT 10:00 A.M. (ET)

SALE PER ORDER OF SECURED PARTY
HOWARD B. D'AMICO, ESQ.
33 WALDO STREET, WORCESTER, MA
ATTORNEY FOR SECURED PARTY

TERMS OF SALE: 25% DEPOSIT CASH, WIRE TRANSFER OR CERTIFIED CHECK
15% BUYERS PREMIUM APPLIES ON ALL ONSITE PURCHASES
18% BUYERS PREMIUM APPLIES ON ALL ONLINE PURCHASES
OTHER TERMS TO BE ANNOUNCED AT TIME OF SALE
INSPECTIONS: TUESDAY, APRIL 29TH 10:00 A.M. TO 4:00 P.M.
& MORNING OF SALE – 8:30 A.M. TO 10:00 A.M.

Aaron Posnik
AUCTIONEERS • APPRAISERS

Aaron Posnik & Co., Inc.
31 Capital Drive
West Springfield, MA 01089

Presorted
First Class Mail
U.S. POSTAGE
PAID
Permit No. 12
Springfield, MA

RETURN SERVICE REQUESTED

LIVE ONSITE AND LIVE WEBCAST BIDDING

MA Auc. Lic. #161
Est. 1932
PA Auc. Lic. #AY000241L
Visit our Website @ www.posnik.com

Aaron Posnik & Co., Inc.
31 Capital Drive • West Springfield, MA 01089
(413) 733-5238 (Fax) 731-6946

Aaron Posnik & Co., Inc.
P.O. Box 247 • Malvern (Philadelphia) PA 19003
(610) 853-6655 (Fax) 583-6633

## WEDNESDAY, APRIL 30TH AT 10:00 A.M. (ET)
## 851 STERLING ROAD LANCASTER, MASSACHUSETTS

OKUMA GENOS M560-V VERTICAL MACHINING CENTER

SODICK AD55L CNC SINKER EDM MACHINE

MAKINO 64 CNC WIRE EDM MACHINE 1 OF 2

FANUC ROBODRILL D14MiAS CNC VERTICAL MILLING CENTER

GENUS M560-V VERTICAL MACHINING CENTER

### BID FROM THE COMFORT OF YOUR OFFICE!!!

If you can't personally attend the auction sale, you don't have to miss out on the bidding. You can bid on the equipment in the following ways:

- LIVE PHONE BID: Call us by MONDAY, APRIL 28TH to set up the details*
- INTERNET BID: Visit www.posnik.com or bidspotter.com to register online.*
- PROXY BID: Call us and we'll be happy to fax you a proxy bid form. Fill it out, fax it back and we'll bid on your lot for you.*

*We must receive a 25% deposit of all proxy and phone bids before the auction to secure your bid. No credit cards.

To Bid Online Visit
www.posnik.com or www.bidspotter.com

Webcasts Powered by
BidSpotter

Aaron Posnik
AUCTIONEERS • APPRAISERS

Aaron Posnik & Co., Inc.
31 Capital Drive • West Springfield, MA 01089
(413) 733-5238 (Fax) 731-6946

MA Auc. Lic. #161 • Est. 1932 • PA Auc. Lic. #AY000241L

Aaron Posnik & Co., Inc.
P.O. Box 247 • Malvern (Philadelphia) PA 19003
(610) 853-6655 (Fax) 683-6633

SECURED PARTY SALE BY

# PUBLIC AUCTION

**LIVE ONSITE AND LIVE WEBCAST BIDDING**

FACILITY CLOSED

## INJECTION MOLD MANUFACTURER

## • CNC VERTICAL MACHINING CENTERS •

• CNC LATHES, GRINDERS & MILLERS •
• CNC EDM SINKER, WIRE & HOLE MACHINES •
• MACHINE TOOLS • TOOLING • INSPECTION EQUIPMENT •
• INJECTION MOLDING MACHINES •
• PLANT SUPPORT & OFFICE EQUIPMENT •

BANCROFT HOLDING LLC D/B/A

851 STERLING ROAD
LANCASTER, MASSACHUSETTS

TO BE SOLD ON THE PREMISES AND BY LIVE INTERNET BIDDING

**WEDNESDAY, APRIL 30TH AT 10:00 A.M. (ET)**

INSPECTIONS: TUESDAY, APRIL 29TH 10:00 A.M. TO 4:00 P.M. & MORNING OF SALE – 8:30 A.M. TO 10:00 A.M.

GENUS M560-V VERTICAL MACHINING CENTER

**Aaron Posnik**
AUCTIONEERS • APPRAISERS

Aaron Posnik & Co., Inc.
31 Capital Drive • West Springfield, MA 01089
(413) 733-5238 (Fax) 731-5946

MA Auc. Lic. #161 • Est. 1932 • PA Auc. Lic. #AY000241L

Aaron Posnik & Co., Inc.
P.O. Box 247 • Malvern, (Philadelphia) PA 19003
(610) 853-6655 (Fax) 583-6633

SECURED PARTY SALE BY

# PUBLIC AUCTION

## LIVE ONSITE AND LIVE WEBCAST BIDDING

FACILITY CLOSED

## INJECTION MOLD MANUFACTURER

BANCROFT HOLDING LLC D/B/A

ACER VERTICAL MILLING MACHINE

OKUMA GENOS VERTICAL MACHINING CENTER

**851 STERLING ROAD, LANCASTER, MASSACHUSETTS**

TO BE SOLD ON THE PREMISES AND BY LIVE INTERNET BIDDING

**WEDNESDAY, APRIL 30TH AT 10:00 A.M. (ET)**

**INSPECTIONS: TUESDAY, APRIL 29TH - 10:00 A.M. TO 4:00 P.M. & MORNING OF SALE - 8:30 A.M. TO 10:00 A.M.**

TERMS & CONDITIONS:
EVERYTHING SOLD "AS IS/WHERE IS"
TERMS OF SALE:
25% DEPOSIT BY CASH, CERTIFIED OR BANK CHECK, OR BANK WIRE TRANSFER. 15% BUYERS PREMIUM APPLIES ON ALL ONSITE PURCHASES. 18% BUYERS PREMIUM APPLIES ON ALL ONLINE PURCHASES. PERSONAL OR COMPANY CHECK ACCEPTED ONLY IF ACCOMPANIED WITH A BANK LETTER GUARANTEEING PAYMENT. EXAMPLE OF BANK LETTER OF GUARANTEE: THIS BANK GUARANTEES PAYMENT TO AARON POSNIK & CO., INC. ON ACCOUNT # _____UP TO THE AMOUNT OF $ _____ FOR PURCHASES MADE AT THE BANCROFT HOLIDNG LLC D/B/A F & M TOOL AND DIES AUCTION TO BE HELD ON WEDNESDAY, APRIL 30TH. NO PURCHASE REMOVED UNTIL COMPLETE SETTLEMENT IS MADE. OTHER TERMS TO BE ANNOUNCED AT TIME OF SALE.
REMOVAL:
PREPPING, LOADING AND TRUCKING ARE THE RESPONSIBILITY OF THE BUYER.
SALES TAX:
MASSACHUSETTS SALES TAX LAWS APPLY. DEALERS BRING COPY OF EXEMPT CERTIFICATE.
BID LIVE BY PHONE:
CALL US BY MONDAY, APRIL 28TH TO SET UP THE DETAILS.
BID LIVE BY INTERNET:
VISIT OUR WEBSITE AT WWW.POSNIK.COM OR WWW.BIDSPOTTER.COM FOR INSTRUCTIONS ON BIDDING ONLINE.
BID BY MAIL:
IF YOU CANNOT ATTEND THIS AUCTION IN PERSON WE WILL BE HAPPY TO RECEIVE YOUR BID ON THE ITEMS THAT YOU DESIGNATE (IF YOUR BID IS SENT BY MAIL OR FAX AND RECEIVED BY OUR OFFICE AT LEAST 24 HOURS PRIOR TO THE COMMENCEMENT OF THE SALE). IF YOU WISH TO BID BY MAIL, KINDLY PROVIDE A COMPLETE LIST OF THE ITEMS DESIRED AND ENCLOSE A 25% DEPOSIT BY CERTIFIED CHECK. YOU WILL BE RESPONSIBLE FOR PURCHASES IF YOU ARE THE HIGH BIDDER, UNDER THE TERMS AND CONDITIONS TO BE ANNOUNCED AT TIME OF SALE. IF YOU ARE THE SUCCESSFUL BIDDER, WE WILL NOTIFY YOU WITHIN 24 HOURS OF THE SALE AND YOU MUST MAKE PAYMENT OF THE BALANCE DUE BY WIRE TRANSFER TO OUR BANK WITHIN 24 HOURS OF NOTIFICATION. IF YOU ARE UNSUCCESSFUL IN YOUR BID, YOUR DEPOSIT WILL BE RETURNED TO YOU WITHIN 72 HOURS OF THE SALE.

THE INFORMATION DESCRIBED IN THIS BROCHURE IS CORRECT TO THE BEST OF OUR KNOWLEDGE BUT WE CANNOT GUARANTEE SAME. IT IS FOR THIS REASON THAT BUYERS SHOULD AVAIL THEMSELVES OF THE OPPORTUNITY FOR INSPECTION PRIOR TO THE SALE.

BRIDGEPORT SERIES 2 VERTICAL MILLER WITH ACCURITE DRO

SHARP SV-4328SX VERTICAL MACHINING CENTER

BRIDGEPORT SERIES 1 VERTICAL MILLER

SHARP SVG-6332A VERTICAL MACHINING CENTER

TRAK DPM CNC VERTICAL MILLING MACHINE

OKOMOTO 12-24 DX SURFACE GRINDER

OKK VP600 VERTICAL MACHINING CENTER

Aaron Posnik & Co., Inc.
31 Capital Drive • West Springfield, MA 01089
(413) 733-5238 (Fax) 731-5946

# WEDNESDAY, APRIL 30TH AT 10:00 A.M. (ET)

HAAS SL10 CNC LATHE

HAAS SUPER MINI MILL

HAAS MINI MILL

FANUC ROBODRILL D14MIA5 CNC VERTICAL MILLING CENTER

## CNC VERTICAL MACHINING CENTERS

- **2021 Okuma Genos M560-V** 3-Axis CNC Vertical Machining Center, 32-Position Automatic Tool Changer, 51" x 22" T-Slot Table, Okuma OSP-P300ma CNC Controls, S/N 237642, w/ Renishaw RMI-Q Probe MP Systems R-Series Coolant System, LSN Chip Conveyor, Daiken Oil Coolant System & Mistbuster •
- **2019 Okuma Genos M560-V** 3-Axis CNC Vertical Machining Center, 32-Position Automatic Tool Changer, 51" x 22" T-Slot Table, Okuma OSP-P300MS CNC Controls, S/N 224465, w/ Renishaw RMI-Q Probe MP Systems R-Series Coolant System, LSN Chip Conveyor, Daiken Oil Coolant System & Mistbuster •
- **2012 Sharp SV-4328SX** 3-Axis CNC Vertical Machining System, 24-Position Automatic Tool Changer, 51" x 26" T-Slot Table, Fanuc Series OI-MD CNC Controls, S/N SV11-1043, w/ Point Coolant System & Fongex Chip Conveyor •
- **2011 Sharp SVG-6332A** 3-Axis CNC Vertical Machining Center, 40-Position Automatic Tool Changer, 71" x 34" T-Slot Table, Coolant System, S/N 2140188, Fanuc Series OI-MA CNC Controls & Fongex Chip Conveyor •
- **2005 OKK VP600** 3-Axis CNC Vertical Machining Center, 20-Position Automatic Tool Changer, Mod. VP600, S/N 201, Manufacturing #MA349, w/ Neumatic 635V CNC Controls & Cooljet Coolant System •
- **2001 Haas Super Mini-Mill** 3-Axis CNC Vertical Machining Center, 32" x 12" T-Slot Table, 10-Position Automatic Tool Changer, Coolant System, Haas CNC Controls, S/N 26450 •
- **2000 Haas Mini Mill** 3-Axis CNC Vertical Machining Center, 36" x 12" T-Slot Table, 10-Position Automatic Tool Changer, Coolant System, Haas CNC Controls, S/N 22635 •
- **1997 Trak DPM** 3-Axis CNC Vertical Milling Machine, 10" x 48" T-Slot Table, Vari-Speed, 1 H.P., Trak AG3 3-Axis D.R.O., S/N 97-2883 •

## CNC VERTICAL MILLING MACHINE

- **2014 Fanuc Robodrill D14MIA5** CNC Vertical Milling Machine, 14-Position Tool Turret, 26" X 16" T-Slot Table, Type A04B-0099-B101 #BM, S/N P143YA751, w/ Renishaw OMI-2 Probe •

## CNC LATHES

- **2008 Haas SL-10** 2-Axis CNC Lathe Tool Pre-setter, 12-Position Tool Turret, Coolant System Haas CNC Controls, S/N 3080995, w/ Foot Controls & Tooling •
- **1998 Mori-Seiki SL-200** 2-Axis CNC Lathe, 26" Swing X 24" B.C., 8" 3-Jaw Chuck, S/N 628, w/ Mori Seiki MSC 500 CNC Controls, Turbo Chip Conveyor, Chip Blaster & Aercology Mist Buster •

## MILLING MACHINES

- **2013 Acer** Vertical Miller, 9" x 50" T-Slot Table, Vari-Speed, Power Feed, 2.2 H.P., S/N 4450, w/ Proto-Trak MXS 3-Axis D.R.O. •
- **Bridgeport Series 2** Vertical Miller, 9" x 42" T-Slot Table, Vari-Speed, 2 H.P., S/N 234327, w/ Accurite 2-Axis D.R.O. •
- **Bridgeport Series 1** Vertical Miller, 9" x 42" T-Slot Table, Vari-Speed, Power Feed, 2 H.P., S/N 243360 •
- **Bridgeport** Vertical Miller, 9" X 48" T-Slot Table, Vari-Speed, 2 H.P., Power Feed, S/N 258478, w/ Proto-Trak MX2 3-Axis D.R.O. •
- **Van Norman** Vertical Miller, 6"x24" T-Slot Table, 1 ½ H.P. •

## LASER ENGRAVER

- **2014 Laser Star**, Class 4, Engraver, w/ Articulating Arm & Positioner, M/N 4V18, S/N 2079 •

## MISCELLANEOUS MACHINERY/EQUIPMENT

- **Ranco** 55-Ton Hyd. H-Frame Shop Press •
- **Westhoff** Horiz. Hi-Speed Precision Drill, WM-100 •
- **(2) Oliver** Wood Lathes, M/N 159A, 3 Ph. •
- **Central** Wood Lathe, M/N 95607, 1 Ph. •
- **(3) Central & Cyclone** Blast Cabinets •
- **Gray Mills** Parts Washer, PH822-R6 •
- **(4) Torit** Dust Collectors, #70, 75, 81 & 84 •
- **Torit** Porta-Trunk Fume Extractor •
- **Torit** Checker Board, 10 H.P., Mod. SDF-3026 • Etc. • Etc. •

## WELDING EQUIPMENT

- **Miller Dynasty 280 DX** Tig Runner Welder w/ Coolmate 1.3 Coolant System •
- Miller Max Star 200 DX Tig Welder, 200 Amps, 3 Ph. •
- **Rocklin** Mold Mender Micro Welder #912 •
- **Dayton** Fume Extractor #3AA20B •
- Cutting & Welding Outfit, w/ Carrier •
- Tig Welding Rods • Welding Curtains •
- (10) 4'-8' Steel Welding Tables & Vises • Etc. •

1998 MORI SEIKI SL-200 CNC LATHE

MILLER DYNASTY 280 DX TIG RUNNER WELDER WITH COOLMATE 1.3 COOLANT SYSTEM

MASS CRANE & HOIST 5-TON FREE STANDING DUAL BRIDGE CRANE

TCM LPG FORKLIFT TRUCK

HARDINGE HC CHUCKER

MA Auc. Lic. #161 • Est. 1932 • PA Auc. Lic. #AY000241

# 851 STERLING ROAD, LANCASTER, MASSACHUSETTS

ZOLLER SMILE 420 TOOL PRESETTER & MEASURING MACHINE

ZOLLER 12D TOOL ORGANIZER & ZOLLER 5D SLIDE OUT TOOL CABINET

LASERSTAR CLASS 4 LASER ENGRAVER

ABNOX REGO FIX CLAMPING MACHINE

## TOOLING

- Haas HA5C 4th Axis 5C Rotary Indexer • Zoller Smile 420 Tool Pre-Setter & Measuring Machine, w/ CNC Controls, S/N Smile 420X-D1958 • Zoller 12D Tool Organizer • Zoller 5D Slide Out Tool Cabinet • 2020 Abnox Rego-Fix CH6330 Press Fit Tool Holding System, w/ Powergrip PGU9500 Automatic Clamping Unit, S/N 1393 • Hirshmann Clamping Sys., Mod. H4110P • Lg. Qty CAT 40 & CAT 50 Taper Tooling • System 3R Wire EDM Tooling • Makino EDM Tooling • System 3R Graphite Tool Holders • (3) Harig Grind All No.1 Indexing Fixtures • Promax & Yuasa Radius & Angle Dressers • (2) Bridgeport Quill Heads • Collet Spinners • Electromagnetic Chucks • 3-Jaw Lathe Chucks • Re-Lock Double Station Vise #RWS4002 • (14) Ass't Kurt Vises • Troyke Rotary Table • Sine Tables • Boring Heads • Hold Down Tools • Parallel Bars • Drill Index Sets • Collets • Angle Plates • Gd. Qty. Perishable Tooling • Huot Tool Scoot Tooling Carts • Etc. • Etc. • Etc. •

★ (7) Lista Tool Storage Cabinets ★

## INSPECTION EQUIPMENT

- Deltronic Optical Comparator, DH214, w/ D.R.O. • Micro-VH Optical Comparator, M/N M301, w/ FocusDetector • Nordson Janome Dispensing Robot Sys., M/N IR24044, w/ Nordon EFD Pico Pulse Jetting Valve, MV-100 • Starrett Dig. Chek Cadillac Height Gage, #258 • Mitutoyo Height Master Cadillac Height Gage, #515-311 • Mitutoyo Dig. Height Gage, Q-HEIGHT-350 • Fowler Trimos Vert. TVA600 Electrical Height Gage • Nikon SMZ860 Stereo Zoom Microscope • Olympus SZ40 Stereo Microscope • Fiber-Lite Hi-Intensity Optic Illuminator #180 • Wilson Rockwell 3R Hardness Tester • (2) Mahr Marameters #844 • (2) Mahr Comparators #1002Z • Mitutoyo, Fowler, Starrett & B&S: O.D. Mic Sets, Depth Mic's, Vernier Calipers, Ht & Dial Indicating Stands, Ht Gages, Etc. • (16) Vermont Pin & Plug Gage Sets, Mi-MG • (16) Deltronics Plug Gage Sets • Starrett Crystal Pink Surface Plates • Do-All Granite Surface Plates • Bore Gages • Gage Block Sets • V-Blocks • Block Clamps • Levels • Sign Plates • Etc. • Etc. • Etc. •

## COORDINATE MEASURING MACHINES

- Brown & Sharp Reflex CMM-XY12, M/N 1196-V190, w/ D.R.O. •

## PLANT SUPPORT

- Process Water Cooling System, 500-Gallon Tank, w/ (2) 15 H.P. Pumps (2) 5 H.P. Pumps & Parker Filter • (2) Global 7' Dual Side 7-Tier Cantilever Racks • (7) Sections H.D. Pallet Racking, w/ Wire Decks • Steel Die & Stock Racks • Pallet Carts • (25) Sections Steel Shelving • Greenlee Wire Rack • Ass't Hand & Elec. Tools • C-Clamps • Bottle Jacks • Utility, Transfer & Sump Pumps • Air Hose Reels • Gorilla Ladder • Uline Stack Ladder • Werner Stepladders • Signode Strapping Machine • Johnson Bar • Shop Vac's • Pedestal Shop Fans • Hyd. Die Carts • Mechanic's Rolling Toolboxes • 4'-5' Steel Worktables •

• Many More Items Too Numerous To Mention •

## INJECTION MOLDING MACHINES

- 1998 Arburg 221M 350-75 Injection Molding Machine, 50-Ton Cap., S/N 173140 • 1993 Arburg Allrounder 221-55-250 Injection Molding Machine, 250-Ton Cap., S/N 156879 • 1995 Van Dorn 50 ET 500-120 Compact Injection Molding Machine, Mod. Ergotech-Compact, S/N 7141-0268, W/ Digital Controls • 1994 Cincinnati Milacron Fanuc Roboshot Injection Molding Machine, 110-Ton Capacity, Mod. ROBO 110R-97G, S/N 4066A01/94-4 • 1994 Cincinnati Fanuc Injection Molding Machine, 110-Ton Cap., Mod. Robo 110R97G, S/N 4066A01/94-8 •

## GRANULATOR

- Nelmore 12" Granulator, Mod. G1012M1, S/N 80/01/14661 •

## AIR COMPRESSORS

- Ingersoll Rand 25 H.P. Rotary Screw Air Compressor, Mod. IRN25-CC-HV, S/N CBV589615, (2008), w/ Zeks Heat Sink Air Dryer, Mod. 75HSGA100, S/N 318431, w/ Air Tank • Gardner Denver Electra-Saver II Rotary Screw Air Compressor, 30 H.P., Mod. EBE99MXX, S/N S104487, (2001), w/ Zeks Air Dryer & Air Tank •

## CRANES

- Mass Crane & Hoist Free Standing Dual Bridge Crane, (2) 16' 5-Ton Single Girder Spans & (2) R&M Spacemaster 5-Ton Cable Hoists, w/ Pendant Controls • 2023 Spanco 8' Steel Gantry Crane, 3-Ton Cap., M/N 3A102-48, w/ Budgit 3-Ton Elec. Hoist • Pittsburg Automotive 8' Port. Gantry Crane, 1-Ton Capacity •

## FORKLIFT

- TCM, Propane, 8,000# Cap., 120" Lift Ht., Side Shifter, Solid Tires, ROPS, Mod. FCG36NTT, S/N A28VD0212, (13,446 Hours) •

## HANDLING EQUIPMENT

- Pittsburg Port. 1-Ton Folding Shop Crane • Wesco Port. Platform Stacker, 1,000# Cap. •

★ (2) Jessco 25-Yd. Self-Dumping Hoppers ★

- Die Lift Truck • Hyd. Pallet Jacks • Chain Hoists • Magnetic Lifting Blocks • Etc. • Etc. •

## ★ OFFICE EQUIPMENT AND FURNISHINGS ★

I.R. AIR COMPERSSOR AND DRYER

GARDNER DENVER AIR COMPRESSOR

1998 ARBURG 221M 350-75 INJECTION MOLDING MACHINE

1994 CINCINNATI MILACRON FANUC INJECTION MOLDING MACHINE

1995 VAN DORN 50ET 500-120 COMPACT INJECTION MOLDING MACHINE

Aaron Posnik & Co., Inc.
P.O. Box 247 • Malvern, (Philadelphia) PA 19003
(610) 853-6655 (Fax) 583-0633

CERTIFICATE OF SERVICE

I, Howard B. D'Amico, Esq. do hereby certify that on this ___ day of April, 2025, I electronically filed the foregoing Motion for Relief from Stay with the United States Bankruptcy Court for the District of Massachusetts using CM/ECF System. I served the foregoing documents on the following CM/ECF participants:

Assistant U.S. Trustee
Richard King
Office of US. Trustee
446 Main Street
14th Floor
Worcester, MA 01608

Trustee
Joseph H. Baldiga
Mirick, O'Connell, DeMallie & Lougee
1800 West Park Drive
Suite 400
Westborough, MA 01581

Debtor's Counsel
David B. Madoff
Madoff & Khoury LLP
124 Washington Street - Suite 202
Foxborough, MA 02035

and upon the following parties, postage prepaid by first-class mail:

Bancroft Holding LLC
851 Sterling Road
Lancaster, MA 01523

Mosley Realty LLC
31 Hayward St
Framingham, MA 02038-2196

Worcester
U. S. Bankruptcy Court
595 Main Street
Worcester, MA 01608-2060

LLPrince Realty Trust
28 Laurel Lane
Princeton, MA 01541-1018

Absolute Haitian Corporation
33 Southgate Street
Worcester, MA 01610-1720

Acadia Insurance Company(Equip Property)
PO Box 639804
Cincinnati, OH 45263-9804

Adaptive CNC Solutions LLC
50 Meadow Pond Road
South Berwick, ME 03908-1951

Adrian Loring Advisors LLC
60 Thoreau Street #192
Concord, MA 01742-2456

Air Filtration Systems LLC
5 Carpenter Street
Pawtucket, RI 02860-1785

American Mold Builders Association
7321 Shadeland Station Way, Suite 285
Indianapolis, IN 46256

Amper Technologies, Inc.
770 N Halsted Street, Suite 308
Chicago, IL 60642-6001

Atlantic Polymers Corp.
PO Box 21
Armonk, NY 10504-0021

Bamberger AMCO Polymers
PO Box 935387
Atlanta, GA 31193-5387

Bauchman's Towing Inc.
5 Enterprise Drive
Londonderry, NH 03053-2158

Beacon Medtech Solutions - MA LLC
32 Jungle Road
Leominster, MA 01453-5273

Belmont Equipment & Technologies
PO Box 710013
Madison Heights, MI 48071

CE Baird Corporation
851 Sterling Road
Lancaster, MA 01523-2915

CMI Tooling & Components Inc.
3275 Deziel Drive
Windsor Ontario N8W 5A5 CANADA

Carpenter Mold Inc
316 County Home Road
Thompson, CT 06277-2845

Central Coating Technologies Inc.
PO Box 3376
Worcester, MA 01613-3376

Central Mass Landscapes
PO Box 60423
Worcester, MA 01606-0423

Chase Card
PO Box 1423
Charlotte, NC 28201-1423

Chaves Heating & Air Conditioning
15 Bonazzoli Avenue
Hudson, MA 01749-2871

Chuck's Grinding, Inc.
8345 Commerce Drive
Chanhassen, MN 55317-8427

Cimatron Technologies Inc.
1445 Kemper Meadow Drive
Cincinnati, OH 45240-1637

Cimquest Inc.
3434 Rt 22 West, Suite 130
Somerville, NJ 08876-6011

Cloud MFG LLC
22306 River Road
Marengo, IL 60152-9280

Comcast
PO Box 70219
Philadelphia, PA 19176-0219

Crews Consulting Group
222 Forbes Road, Suite 108
Braintree, MA 02184-2706

DME Company
PO Box 854867
Minneapolis, MN 55485-4867

DMS
1875 Blackacre Drive
Old Castle, ON N0R1L0 CANADA

EMT Co.
PO Box 9478
Warwick, RI 02889-0478

Edro Specialty Steels LLC
20500 Carrey Road
Walnut, CA 91789-2417

Equipment Finance Group, LLC
200 Clark Street
Dayton, KY 41074-1368

F&M Sales LLC
25 Jytek Road
Leominster, MA 01453-5934

FCS North America
1-5305 Pulleyblank Street
Old Castle Ontario N9G 0B8 CANADA

GO Engineer LLC
1787 F Fort Union Blvd, Suite 200
Salt Lake City, UT 84121

Gordon Duncan
62 Drury Lane
Worcester, MA 01609-1644

Grainger
Dept. 878829373
Palatine, IL 60038-0001

Gray, Gray & Gray LLP
150 Royall Street, Suite 102
Canton, MA 02021-1054

Hardline Heat Treating
134 Ashland Avenue
Southbridge, MA 01550-2804

Haven Meteorology LLC
13694 172nd Avenue
Grand Haven, MI 49417-8908

Husky Injection Molding System
PO Box 277927
Atlanta, GA 30384-7927

Hydro Air
PO Box 782056
Philadelphia, PA 19178-2056

Hyundai Motor Finance
PO Box 650805
Dallas, TX 75265-0805

Illionois Pro-Turn Inc.
40 Detroit Street, Unit 1
Cary, IL 60013-6605

Industrial Air Compressor, LLC
213 School Street
Gardner, MA 01440-2782

Industrial Tool Supply, Inc.
2 Carl Thompston Road
Westford, MA 01886-1561

Jaffrael LLC
4240 Galt Ocean Dr #850
Fort Lauderdale, FL 33308-6182

Kenneth Crosby A DXP Company
PO Box 840511
Dallas, TX 75284-0511

Kimball Midwest
Dept. L-2780
Columbus, OH 43260-0001

LLPrince Realty Trust
Attn: Craig A. Bovaird, Trustee
28 Laurel Lane
Princeton, MA 01541-1018

Lancaster Sewer District Commission
PO Box 773
South Lancaster, MA 01561-0773

Leominster Cleaning Services
84 Sycamore Drive
Leominster, MA 01453-4976

Liberty Supply Inc.
195 Hamilton Street
Leominster, MA 01453-2355

Lillyworks, Inc.
1 Liberty Lane, Suite 210
Hampton, NH 03842-1840

Lindco Springfield
176 Wayside Avenue
West Springfield, MA 01089-1383

Louis P. Cote, Inc.
42 Cote Avenue
Atlanta, GA 30353

MGM Properties Inc.
19 Sherwood Drive
Sterling, MA 01564-2453

Machinery Finance Resources
651 Day Hill Road
Windsor, CT 06095-1798

Maniko Inc.
Dept Ch 16443
Palatine, IL 60055-0001

Massachusetts Dept. of Transportation Registry of Motor Vehicles
PO Box 55891
Boston, MA 02205-5891

McMaster-Carr Supply Co.
PO Box 7690
Chicago, IL 60680-7690

Mclane Middleton 900 Elm Street
PO Box 326
Manchester, NH 03105-0326

Meusburger US Inc.
4600 Lebanon Road, Ste A1
Charlotte, NC 28227-8252

Michael F. Gasbarro
118 Clubhouse Drive
Leominster, MA 01453-5196

Millennium Alarm Technologies, Inc.
PO Box 359
Leominster, MA 01453-0359

National Grid
PO Box 371396
Pittsburgh, PA 15250-7396

National Tooling & Machining
1357 Rockside Road
Cleveland, OH 44134-2776

Nova Tech, Inc.
345 Farnum Pike
Smithfield, RI 02917-1205

Nutmeg Chrome Corporation
111 Vanderbilt Avenue
West Hartford, CT 06110-1554

Oerlikon Balzers Coating USA Inc.
27228 Network Place
Chicago, IL 60673-1272

Osterman Propane
22 Legate Hill Road
Sterling, MA 01564-2312

PCS Company Dept 771831
PO Box 7700
Detroit, MI 48277-0001

Paul H. Gesswein & Co Inc.
PO Box 3998255
Hancock Avenue
Bridgeport, CT 06605

Poly Plating, Inc.
2096 Westover Road
Westover Industrial Airpark
Chicopee, MA 01022-1079

Progressive Components Intl Inc.
PO Box 734434
Chicago, IL 60673-4434

RLG Associates
PO Box 549
Swansea, MA 02777-0549

Regal Components Inc.
10 Almeida Avenue
East Providence, RI 02914-1027

Robert Sosin, Esq.
Alspector, Sosin & Noveck, PLLC
30100 Telegraph Road, Suite 360
Franklin, MI 48025-5804

Ross Express, LLC
PO Box 8909
Concord, NH 03303

Science of Business Inc.
1881 W Placita De Diciembre
Green Valley, AZ 85622-5427

Scott Duncan
62 Campground Road
West Boylston, MA 01583-1270

Special Mold Engineering Inc.
1900 Production Drive
Rochester, MI 48309-3352

Specialized Industrial Services
21 Town Forest Road
Webster, MA 01570-3112

Synventive Molding Solutions
PO Box 67000
Detroit, MI 48267-0002

TRMEF Basis II, LLC
c/o Ezerc LLC
608 SW 4th Ave
Fort Lauderdale, FL 33315-1012

The Chapin & Bangs Co.
PO Box 1117
Bridgeport, CT 06601-1117

The Robert E. Morris Company
NW 7968-01
PO Box 1450
Minneapolis, MN 55485-1450

Town of Berlin
PO Box 41
Berlin, MA 01503-0041

Town of Lancaster
701 Main Street, Suite 5
Lancaster, MA 01523-2335

Town of Lancaster - Water
701 Main Street, Suite 5
Lancaster, MA 01523-2335

Tracey Gear & Precision Shaft
740 York Avenue
Pawtucket, RI 02861-2846

Tremblay
8111 Roll & Hold Parkway
Macedonia, OH 44056-2161

Trident Machine Tools, Inc.
NW 7968-04
PO Box 1450
Minneapolis, MN 55485-1450

U.S. Small Business Administration
2 North Street, Suite 320
Birmingham, AL 35203

UniFirst
PO Box 650481
Dallas, TX 75265-0481

WB Mason
P.O. Box 981101
Boston, MA 02298-1101

Warehouse Plastics Co Inc.
50 Howe Ave
Millbury, MA 01527-3264

Yitaisheng (Kunshan) Intl Trade Co Ltd
RM 2115 B5STL INTL EQPT PROC CENT
No 1288 Chegbei Rd
Kunshan Suzhou 215300 CHINA

eci ShopTech
PO Box 411110
Boston, MA 02241-1110

DMS Company
1875 Blackacre Drive
Old Castle, ON N0R1L0 CANADA

*/s/ Howard B. D'Amico*
Howard B. D'Amico